UNITED STATES of America, Appellee,

v.

John C. MANDANICI, Jr.,
Defendant-Appellant.

No. 298, Docket 83–1238.

United States Court of Appeals,
Second Circuit.

Argued Oct. 24, 1983.
Decided March 7, 1984.

Harold James Pickerstein, Asst. U.S. Atty., Bridgeport, Conn. (Alan H. Nevas, U.S. Atty., D. Conn., William I. Shockley, Asst. U.S. Atty., Bridgeport, Conn., on brief), for appellee.

Andrew B. Bowman, Westport, Conn., for defendant-appellant.

Before OAKES and KEARSE, Circuit Judges, and WYZANSKI, District Judge.*

---

KEARSE, Circuit Judge:

Defendant John C. Mandanici, Jr., appeals from a judgment entered in the United States District Court for the District of Connecticut, after a jury trial before Robert C. Zampano, *Judge*, convicting him on three counts of making false statements in a matter within the jurisdiction of the Department of Housing and Urban Development ("HUD"), in violation of 18 U.S.C. § 1001 (1976). Mandanici was sentenced (a) on count three, to a five-year term of imprisonment, execution of which was suspended, a fine of $10,000 to be paid within twelve months, and probation for three years; (b) on count two, to a five-year prison term, execution of which was suspended, and a $10,000 fine to be paid within twelve months, such penalty to be consecutive to that imposed on count three; and (c) on count one, to a five-year term of imprisonment, execution of which was suspended, and probation for two years, to be concurrent with the sentences imposed on counts two and three. On appeal Mandanici contends principally that the evidence presented at trial was insufficient to support his conviction. We agree as to count one and reverse as to that count; we affirm the convictions on counts two and three.

## I. BACKGROUND

Mandanici was the owner of an apartment building at 1477 Central Avenue, Bridgeport, Connecticut ("1477 Building" or "Building") as to which he sought and received rent subsidy benefits under the HUD-funded Section 8 Moderate Rehabilitation Program described at 24 C.F.R. § 882 (1980) ("Section 8 Program"). The Section 8 Program, designed to provide decent, safe, and sanitary housing for low income persons through the moderate rehabilitation of properties owned by private landlords, *id.,* was administered by state Public Housing Authorities ("PHAs") funded by HUD through Annual Contribution Contracts. To participate in the Section 8

---

* Honorable Charles E. Wyzanski, Jr., Senior Judge of the District of Massachusetts, sitting by designation.

Program, a landlord was required (1) to have a building needing repair of a major component, such as a roof or heating system, (2) to complete rehabilitation work approved by the local PHA, and to spend in that work at least $1000 times the number of qualifying units,[1] and (3) to complete and file a number of HUD documents with the local PHA. Upon satisfaction of these requirements, the landlord was guaranteed, for a period of up to 15 years, a per-qualifying-apartment rental of between 100% and 140% of their fair market rental as determined by HUD.

The HUD documents to be filed by a landlord in connection with the Section 8 Program consisted of three types of printed forms designed to enable the local PHA to evaluate the landlord's rehabilitation proposal and to monitor his completion of the agreed work. The first document was the initial application form ("Application"), in which the landlord described the building, briefly summarized the proposed rehabilitation, and estimated the cost of such rehabilitation. The second, to be completed and filed by the landlord after approval of the Application by the local PHA, was an Agreement to Enter into Housing Assistance Payments Contract ("AHAP Contract"). In the AHAP Contract, which governed the contractual relationship between the landlord and the local PHA during the rehabilitation, the landlord was to (1) provide a more detailed description of the approved rehabilitation and its expected cost, and (2) promise to perform this rehabilitation in accordance with an agreed-upon schedule which stated deadlines for the commencement and completion of the work. The third document to be completed and filed by the landlord was a Housing Assistance Payment Contract ("HAP Contract"), certifying that the approved rehabilitation of the units qualifying under the Section 8 Program either had been completed in accordance with the provisions of the AHAP Contract or would be completed "in accordance with the terms on which the units were accepted." Once the HAP Contract was completed and signed by both the landlord and an agent of the local PHA, the landlord would begin to receive HUD-funded rent subsidies from the local PHA. Both the AHAP Contract and the HAP Contract bore express warnings that the knowing and willful making of a false statement therein could subject the maker of the statement to prosecution under 18 U.S.C. § 1001.

The Section 8 Program in Bridgeport was administered by the Housing Authority of the City of Bridgeport ("Bridgeport HA"), which had been allocated funding by HUD for a total of 100 apartment units in the Bridgeport area. In October 1980, Mandanici applied to participate in the Section 8 Program by filing an Application for rent subsidies for all 88 units in his 1477 Building. This Application was followed by an AHAP Contract dated December 1, 1980, and, eventually, a HAP Contract dated July 1, 1981.

In 1982, a federal grand jury indicted Mandanici on three counts of making false statements in these three documents.[2] Count one charged that Mandanici had violated 18 U.S.C. § 1001 by representing in his Application "that he would perform rehabilitation work on property owned by him ..., said work to cost an estimated $88,000 whereas, ... as [Mandanici] then and there well knew, the rehabilitation work that he agreed to perform would not cost $88,000." Count two charged that Mandanici had violated § 1001 by representing in his AHAP Contract "that he would perform a total of $88,000 in rehabilitation work on property owned by him ..., whereas, ... as [Mandanici] then well knew, the rehabilitation work that he per-

---

**1.** An apartment unit within an approved building qualified for the Section 8 Program if the unit was inhabited by a low income individual who was not participating in another HUD-funded rent subsidy program. *See* 24 C.F.R. §§ 882.401(c)(2), 882.504(e).

**2.** In a fourth count the grand jury charged Mandanici with making a false statement to a federally insured bank, in violation of 18 U.S.C. § 1014 (1976). Mandanici was acquitted on this count.

formed on the said property would not cost $88,000." Count three charged that Mandanici had violated § 1001 by representing in his July 1, 1981 HAP Contract "that property owned by him ... had been rehabilitated in accordance with the terms and conditions of the ... [AHAP] Contract, ... whereas, ... as [Mandanici] then well knew, the work had not been performed in accordance with the terms of the ... [AHAP] Contract."

## A. *The Evidence at Trial*

In his initial application in October 1980, Mandanici gave a brief description of the proposed rehabilitation and estimated its total cost at $88,000. In completing his Application Mandanici was assisted by Joseph Gambino, a registered architect employed by Bridgeport HA to aid Section 8 Program applicants in making cost estimates for their buildings. Gambino conducted a cursory inspection of the 1477 Building, determined that a major component of the 1477 Building—the roof—was in need of repair, and listed on Mandanici's Application the following general work that was necessary to make the units in the 1477 building safe, decent, and sanitary: installation of a new roof, repair and replacement of broken windows, patching and plastering of walls, caulking of windows, installation of smoke detectors, elevator repair, insulation of pipes, and repair of the electrical system. Gambino also estimated the cost of the proposed rehabilitation at $88,000, and listed this cost on Mandanici's Application. Mandanici signed the Application, certifying "that the data ... contained in this Application ... are true, correct, and complete."

Mandanici's Application was approved by Bridgeport HA, which officially informed Mandanici of its approval by letter dated November 12, 1980. This letter reaffirmed that a minimum investment by Mandanici of $88,000 was required for participation in the Section 8 Program.

Gambino then began assisting Mandanici to prepare a final "work write-up," specifying each rehabilitation task to be per-

formed on the 1477 Building and the estimated cost (taken by Gambino from a trade cost-estimate book) of each such task. In the process, Gambino reminded Mandanici that his entitlement to Section 8 Program benefits depended on his spending $88,000. The work write-up specified a five-ply roof to be placed on the building at a cost of $23,000; 500 thermal windows replaced at a cost of $5000; walls of the apartments patched and plastered at a cost of $100 per unit, for a total cost of $8800; windows caulked at a cost of $5 per unit, for a total of $440; a crane rented at a cost of $500 per day for seven days to hoist the caulkers to the windows, for a total of $3500; 192 smoke detectors installed at a cost of $50 each, totaling $9600; kitchen cabinets repaired and replaced at a cost of $2000; carpeting replaced at a cost of $1800; door frames replaced at a cost of $9000; elevator oil packing gland repaired at a cost of $1000; sanitary soil lines insulated at an approximate cost of $4280; broken pipes replaced in the cellar at a cost of $396; electrical system repaired at a cost of $5000; and 344 window screens installed at a cost of $30 each, totaling $10,320. Finally, administrative costs in the amount of $3864 were added, bringing the total to $88,000. Mandanici attached this work write-up as Exhibit B to his AHAP Contract, "agree[ing] to complete the rehabilitation ... in accordance with the work write-up."

The AHAP Contract imposed on Mandanici a schedule for commencement and completion of the rehabilitation work. It provided that the work was to be commenced not later than February 1, 1981. It provided that the work was to be completed not later than 60 days after the effective date of the AHAP Contract. Since Mandanici's AHAP Contract was dated December 1, 1980, the 60-day period for completion expired on January 30, 1981.

On December 12, 1980, Mandanici executed and filed his first HAP Contract—a document that was later renegotiated and was not made the subject of a count of the indictment—warranting "that the unit[s]

ha[ve] been rehabilitated in accordance with the terms and conditions of the [AHAP Contract] ... or will be completed in accordance with the terms on which the unit[s] w[ere] accepted." In addition to this first HAP Contract, Mandanici submitted to Bridgeport HA, sometime in December 1980 or January 1981, an undated letter (the "Undated Letter") stating that the agreed-upon rehabilitation had been completed and enclosing bills and receipts in support of that statement. This letter, signed by Mandanici, read as follows:

> In regards to the rehabilitation of the 1477 [Building], we are hereby informing you that we have completed the rehabilitation of our buildings in accordance with your work write up/cost estimate. Enclosed you will find receipts of paid bills docuementing [*sic*] the work and amounts spent on this project.

Upon execution of the December 12, 1980 HAP Contract by Mandanici and Bridgeport HA, Mandanici was guaranteed, over a period of 15 years for 79 of the Building's apartments, a per-apartment rental of 120% of the fair market rental as determined by HUD. Bridgeport HA began paying rent subsidies to Mandanici on December 15, 1980.

Shortly thereafter, Bridgeport HA was notified that HUD had discovered irregularities in the Section 8 Program administered by Bridgeport HA. To cure these irregularities, HUD required, *inter alia,* that Mandanici's first HAP Contract be renegotiated. On July 1, 1981, Mandanici completed and filed his renegotiated HAP Contract, which stated "that the unit[s] ha[ve] been rehabilitated in accordance with the terms and conditions of the [AHAP Contract] ... or will be completed in accordance with the terms on which the unit[s] w[ere] accepted." Despite the renegotiation of Mandanici's first HAP Contract, there was no interruption in his receipt of rent subsidy payments, and the payments to him totaled approximately $402,789.

Notwithstanding the representations made in his Undated Letter and his July 1, 1981 HAP Contract, it is undisputed that Mandanici had not completed the agreed-upon rehabilitation by the end of January 1981, nor by July 1, 1981, nor even by the time of his trial in February 1983. Further, although Mandanici had presented to Bridgeport HA, with his Undated Letter, documents that he represented were "receipts of paid bills docuementing [*sic*] the work and amounts spent on this project," and had told Gambino that the work had been done, the government presented as witnesses numerous contractors who testified that the work purportedly reflected in these documents had not been done, or had been done for a lower price than that shown, or had been done for one of Mandanici's other buildings.

For example, Charles Hrynewsky, the owner of Carpet City, Incorporated, identified a purported bill for $5,248.69 as merely an estimate that he provided to Mandanici; the only work he had done on the 1477 Building was represented by another document, and the charge was $917. James McCarthy, who owned a crane that he occasionally allowed Mandanici to use, identified certain documents as forms used by his company but denied that he had completed these forms, which Mandanici had submitted to Bridgeport HA as evidence that Mandanici had paid $3500 to McCarthy's company for the rental of a crane in order to caulk windows. McCarthy testified that he never so rented his crane. John Lockshier, a roofing contractor, testified that although he had provided Mandanici with an estimate of $21,650 for re-roofing the 1477 Building with a five-ply roof, he in fact installed a less durable three-ply roof on the 1477 Building and billed Mandanici only $13,865. Robert Jenacarro testified that a purported bill from his company for $8900 for wall repairs was only an estimate prepared at Mandanici's request; that another purported bill for $465 for caulking of windows was also an estimate; and that yet another purported bill for $9600 for smoke detectors was likewise an estimate, and that he in fact sold Mandanici smoke detectors for $3000. Carmen Tortora, Jr., a plumbing contractor,

identified a purported bill for $7350 as an estimate he gave Mandanici for repair and insulation of sanitary pipes; Tortora testified that he never performed the work set forth on the estimate, and that Mandanici had asked him for a blank signed invoice, which Tortora refused to give him. Abraham Goldbloom identified a purported bill for $9895 for window screens as only an estimate he had given and testified that the work he actually performed was worth only some $6000. Richard Clark, an electrician, testified that while he was working at another building owned by Mandanici, Mandanici asked him for a receipt for what had been done ($1000) and that in response he gave Mandanici a blank bill marked "paid-in-full." Clark identified a purported paid bill from him in the amount of $5800 for work allegedly done on the 1477 Building as the blank receipt he had given for the other work. He testified that he had never done any work at the 1477 Building.

Mandanici testified in his own behalf. He testified principally that he intended to complete the agreed-upon rehabilitation but believed, because of the conflict between the completion and commencement dates in the AHAP Contract, that there was no deadline for rehabilitation work begun by February 1, 1981; that he had submitted the Undated Letter only because Gambino had requested it, and that he did not date this letter because he wanted to avoid making a false statement when he represented that the rehabilitation work had been completed; that he had never represented that the estimates attached to the Undated Letter were paid bills; and that between October 1, 1980, and May 10, 1982, he had spent some $56,000 on rehabilitation work at the 1477 Building. On cross-examination, Mandanici admitted, *inter alia*, that much of the $56,000 may have been spent not on the agreed-upon rehabilitation, but rather on cosmetic repair and routine maintenance that could not be credited toward the required $88,000.

The jury found Mandanici guilty on all three counts charging violations of § 1001. Mandanici's motions for acquittal were denied. This appeal followed.

## II.  DISCUSSION

On appeal, Mandanici claims principally that there was insufficient evidence to support a conviction against him on any count. Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we agree with respect to count one and disagree as to counts two and three.[3]

### A.  Count One

■   Section 1001 of 18 U.S.C. provides as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Count one of the indictment charged that Mandanici made a false statement in his initial Application. In that document Mandanici gave the required brief description of the anticipated rehabilitation work, which was as follows:

Install new roof, replace broken windows, patch and plaster walls, flash and/or caulk windows, smoke detectors, repair elevator, insulate pipes, repair electrical system.

He stated that the total estimated cost was $88,000. Count one alleged that the Application violated § 1001 because Mandanici knew that "the rehabilitation work that he

---

**3.**  We have also examined Mandanici's other claims as to counts two and three and found

them to be without merit.

agreed to perform would not cost $88,000." The evidence does not support this charge.

The government's proof at trial was directed toward the propositions that Mandanici did not spend the moneys he claimed he had spent, and that he had not intended to spend those moneys. Count one, however, has a different thrust, presumably because the Application form did not require Mandanici to represent (nor did he there represent) that he would complete the proposed rehabilitation or that he would spend the estimated amount. Rather, as the government acknowledges, "the allegation of falsity [in count one] is ... not that [Mandanici] knew he would not perform the work and that he did not intend to spend the money" (Government's brief at 18), but "that Mandanici knew the work [described in the Application] would not cost $88,000" (*id.*). We see no evidence in the record from which a rational juror could have drawn an inference that the work described in the Application could not cost $88,000. The estimate in the Application was prepared with the assistance of Bridgeport HA's Gambino; Gambino's later detailed estimates used a cost-estimate trade book in arriving at the $88,000 figure; and there is nothing in the record to indicate that the work described could not legitimately have cost $88,000. Indeed, the import of much of the government's evidence was that the work would have cost that amount had Mandanici not cheated. Since the charge in count one does not relate to Mandanici's intentions or to his actions but only to his knowledge of what such work would cost, and since we have found no evidence in the record to show that he had the knowledge alleged, we conclude that the conviction on count one must be reversed.

### B. *Count Two*

We have no such difficulty with the sufficiency of the evidence on count two. That count centered on Mandanici's AHAP Contract of December 1, 1980, in which Mandanici agreed to complete the rehabilitation projects "in accordance with the work write-up attached as Exhibit B." Exhibit B specified the tasks and the amounts to be expended on each. Count two charged that Mandanici falsely represented in the AHAP Contract "*that he would perform a total of $88,000 in rehabilitation work* on [the 1477 Building] whereas ... [he] then well knew [that] the rehabilitation work that *he* performed on the said property would *not cost $88,000.*" (Emphasis added.)

The evidence amply supports this charge. Within weeks of submitting the AHAP Contract, Mandanici represented in his Undated Letter that the work was completed, whereas it was not. At the same time he submitted false documentation of his purported expenditures with respect to nearly every task detailed in Exhibit B. The jury could easily infer from the evidence that in the AHAP Contract Mandanici had falsely represented his intentions.

### C. *Count Three*

Count three of the indictment centered on Mandanici's HAP Contract dated July 1, 1981, in which Mandanici "warrant[ed] that the unit[s] ... [have] been rehabilitated in accordance with the terms and conditions of the ... [AHAP] Contract ... or will be completed in accordance with the terms on which the unit[s] w[ere] accepted." Count three charged that the HAP Contract contained Mandanici's false representation that the 1477 Building "had been rehabilitated in accordance with the terms and conditions of the" AHAP Contract when he then knew that "the work had not been performed in accordance with the terms of the" AHAP Contract. Mandanici challenges the failure of count three to recite the full disjunctive warranty he made in the HAP Contract, contends that the disjunctive representation he made in the HAP Contract was literally true, and argues that in any event there was insufficient evidence to support his conviction on this count. We disagree.

Mandanici first attacks his conviction on count three because count three charged that he represented that the work

was completed and omitted the language "or will be completed in accordance with the terms on which the unit[s] w[ere] accepted." While we agree that it is preferable for an indictment to set out the full text of the alleged false statement, the failure to do so in this case did not in any way prejudice Mandanici. We see no indication that the grand jury was not presented with Mandanici's complete HAP Contract, and the record is clear that the petit jury was informed on several occasions of the full text of the representation Mandanici made in the HAP Contract. There is no indication in the record that either body was led to believe that Mandanici made only the first portion of this disjunctive representation.

■ Nor do we find merit in Mandanici's claim that his HAP Contract representation—*i.e.*, that the work either was completed or would be completed in the future—was literally true. While a defendant may not be convicted under § 1001 on the basis of a statement that is, although misleading, literally true, *see Bronston v. United States*, 409 U.S. 352, 359–62, 93 S.Ct. 595, 600–01, 34 L.Ed.2d 568 (1973), the factual premise for application of this principle here is absent. First, even as to the possibility of future completion, the HAP Contract required that the work be completed on the terms agreed to in the AHAP Contract. The AHAP Contract required that the work be completed not later than 60 days after the AHAP Contract was entered into—here not later than January 30, 1981. Hence the July 1, 1981 HAP Contract could make no meaningful representation of future completion within the terms to which Mandanici had agreed. Mandanici's testimony that he believed there was no agreed completion date for work commenced prior to February 1, 1981 was an argument for the jury to assess. Its rejection was consistent with the language of the AHAP Contract and with the overwhelming evidence presented by the government. Indeed, there was ample proof from which the jury could find that Mandanici had no intention of ever completing the agreed-upon work.

CONCLUSION

The conviction on count one is reversed and count one is dismissed. The judgment of conviction on counts two and three is affirmed.