[364] Garwood

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-9074

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NITIN SHAH,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Texas

_____

(January 31, 1995)

Before POLITZ, Chief Judge, GARWOOD, and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Nitin Shah (Shah) appeals his conviction, following a jury trial, of making a false statement in violation of 18 U.S.C. § 1001.  We affirm.

**Facts and Proceedings Below**

The evidence, viewed in the light most favorable to the verdict, reflects the following.

On June 9, 1992, the General Services Administration (GSA) issued a solicitation for the purchase of irons, ironing boards, and ironing board pads.  The solicitation called for a bid from

each of a number of prospective suppliers.  Because the bid was to be negotiated, not sealed, the offeror was allowed to alter the price after submission but before the award.  Among the prospective bidders was Omega Electronics (Omega), a small California company that had held the previous contract for steam irons with GSA. Omega had also previously dealt with GSA and the GSA contract specialist, Linda Brainard (Brainard), on an undisclosed number of small purchase contracts.  Brainard testified that these contracts occasioned numerous telephone contacts between her and Shah, Omega's president.

On July 1, 1992, GSA mailed the solicitation for iron products to Omega's address in San Carlos, California.  The solicitation contained the following language under section 13, entitled "Certificate of Independent Price Determination":

"(a)  The offeror certifies thatSQ
      (1)  The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods or factors used to calculate the prices offered;
      (2)  The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or before contract award (in the case of a negotiated solicitation) unless otherwise required by law; and
      (3)  No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

"(b)  Each signature on the offer is considered to be a certification . . . that the signatorySQ
      (1) . . . has not participated and will not participate in any action contrary to subparagraphs

2

(a)(1) through (a)(3) above . . . ."

The same solicitation was also sent to Kipper & Company, a New York concern specializing in the supply of hand and power tools to commercial and governmental customers. Jerome Kipper (Kipper), president of Kipper & Company, testified that he and Shah had spoken a "few times" on the telephone.[1] Besides these conversations, which occurred sometime in November or December of 1991, Shah and Kipper communicated only occasionally and very briefly during the early part of 1992.

On July 7, 1992, shortly after Omega received the GSA solicitation but one day before Omega sent it out, Shah telephoned Kipper and suggested that they share their bids. Shah explained that, by fixing and exchanging price information, they could rig the bidding and thus split the award. According to his plan, Shah would acquire the delivery depots west of the Mississippi, while Kipper would take those to the east. In response to this proposal, Kipper told Shah that he "questioned . . . [Shah's] ethic but admired his ambition." Although he clearly did not agree to trade price information, Kipper testified that he was "non-committal" at the close of the conversation. Shah again left his phone number.

The next day, July 8, 1992, Shah signed and mailed the solicitation to GSA, in which he certified that the prices contained in the bid "have not been and will not be disclosed." In the solicitation, he identified himself as the Managing Partner of Omega and listed the San Carlos, California, address as well as the

_____

[1]     During those conversations, Shah sought a price quote on a large quantity of Black & Decker irons.

telephone number earlier given to Kipper. Shah also filled in blanks throughout the solicitation, including information above and below section 13, the certification of independent price determination.

Kipper reported his July 7 conversation with Shah to both GSA and his attorney. Under the supervision of a GSA investigator, Kipper made two telephone calls to Shah on July 15, 1992, several days after both Kipper and Shah had submitted their bids to GSA. Both conversations were recorded and transcribed. In the first call, Kipper introduced himself and apologized for not having called him back "the other day." In vague terms, Kipper reminded Shah of their July 7 conversation. After agreeing that they could still withdraw their submitted bids, Shah asserted that the swapping of price information would be to their mutual advantage.[2] When Kipper asked Shah if he had ever swapped prices with other vendors, Shah answered,

> "No. This is the first occasion and I SQ you sounded that you're a . . . shrewd businessman, and you will understand the logistics and mechanics of it, so that's why I talk to you frankly. I wouldn't be talking . . . like this to anybody else.
>
> "MR. KIPPER: Okay.
>
> "MR. SHAH: I just took a calculated risk, rather. You know, you can only talk . . . to certain people, not all the people would be cooperative and all that. . . . I hope you understand what I'm saying."

Without detailing a plan to swap prices, Kipper ended the conversation and told Shah he would call him back. The jury heard

---

[2] Shah observed that, in a bidding battle, "we lose money and the Government gains that"; he described the plan as working "together as a complement rather than an adversary."

this entire conversation. Although the transcript and audiotape of the second July 15 conversation were not put in evidence, Kipper testified that, during that conversation, they agreed to fax to each other their bids and, further, that Shah requested confidentiality. They then carried out this agreement.[3]

On January 6, 1993, a grand jury returned a one-count indictment against Shah charging him with "knowingly and willfully" having made a "false, fictitious and fraudulent" statement to GSA, a government agency, contrary to 18 U.S.C. § 1001, namely "the statement that the prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening or contract award." The indictment formed the basis of an arrest warrant, which two GSA special officers executed at Shah's San Carlos, California, address. After entering a plea of not guilty, Shah was tried and convicted before a jury in July 1993. At the close of the government's case (Shah presented no evidence), Shah properly but unsuccessfully moved for acquittal. He was sentenced to three years' probation and fined $5,000. Shah filed a timely appeal.

## Discussion

On appeal, Shah contends that the jury lacked sufficient evidence of identity and falsity, that the court erred in refusing a proposed instruction, and that the indictment varied fatally from

---

[3]  Shah faxed Kipper a copy of the bid pages from his solicitation, and Kipper sent fictitious price information in exchange. The actual fax was retrieved by Kipper & Company's vice president, Adam Mellon, who authenticated the document at trial.

5

the proof at trial. Shah also argues that a promise of future performance cannot, as a matter of law, constitute a violation of 18 U.S.C. § 1001. This last issue, as well as the related evidentiary claim, are the pith of Shah's appeal and, for that reason, will be discussed first.

Section 1001, known as the False Claims Act, prohibits the knowing and willful making of "false, fictitious or fraudulent statements or representations"[4] on a matter "within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1001.[5] The purpose of this broadly worded statute is "to protect the authorized functions of governmental departments and agencies from the perversion which might result from . . . deceptive practices." *United States v. Gilliand*, 61 S.Ct. 518, 522 (1941). To establish a violation, the government must prove five elements: "(1) a statement, that is (2) false (3) and material,

---

[4]    In applying the terms "false, fictitious or fraudulent," we have emphasized the potentially perverting effect of the statements, which "must have a natural tendency to influence, or be capable of affecting or influencing, a governmental function." *United States v. Markham*, 537 F.2d 187, 196 (5th Cir. 1976), *cert. denied*, 97 S.Ct. 739 (1977). The alleged "misrepresentation need not have influenced the actions of the Government agency, and the Government agents need not have been actually deceived." *Id.*

[5]    Section 1001 provides:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

(4) made with the requisite specific intent, [and] (5) within the purview of government agency jurisdiction." *United States v. Puente*, 982 F.2d 156, 158 (5th Cir.) (quoting *United States v. Lichenstein*, 610 F.2d 1272, 1276 (5th Cir.), *cert. denied*, 100 S.Ct. 2991 (1980)), *cert. denied*, 113 S.Ct. 2934 (1993).[6] With regard to the "requisite specific intent," we have observed, "A false representation is one . . . made with an intent to deceive or mislead." *United States v. Guzman*, 781 F.2d 428, 431 (5th Cir.), *cert. denied*, 106 S.Ct. 1798 (1986).[7] In words more relevant to this case, the district court correctly instructed the jury that the government must prove "that the defendant made the false statement for the purposes of misleading the General Services Administration."

The central issue in this case, however, focuses only on the

---

[6] In this Circuit, whether a statement is material is a question of law. *United States v. McIntosh*, 655 F.2d 80, 82 (5th Cir. 1981), *cert. denied*, 102 S.Ct. 1450 (1982). *Contra United States v. Gaudin*, 28 F.3d 943 (9th Cir. 1994) (en banc) (breaking with every other circuit decision on point to rule that materiality is a question of fact for the jury), *cert. granted in part*, 63 U.S.L.W. 3268 (Jan. 6, 1995). This question was therefore not before the jury.

[7] Section 1001, however, "does not require an intent to defraud SQthat is, the intent to deprive someone of something by means of deceit." *Lichenstein*, 610 F.2d at 1277. In this sense, the False Claims Act seeks to protect more than the simple proprietary interests of the federal government; it "has for its object the protection and welfare of the government," specifically protection against "deceit, craft or trickery" designed "to interfere with or obstruct one of [the United States's] lawful government functions." *McNally v. United States*, 107 S.Ct. 2875, 2881 n.8 (1987) (citation omitted). Section 1001 is thus distinct from general fraud statutes, such as the mail fraud statute, wherein "any benefit which the Government derives from the statute must be limited to the Government's interests as property holder." *Id.*

second element, falsity. We are asked to decide whether what Shah stated or represented in the solicitation could violate section 1001, and, if so, whether the government proved that it did. The critical language in the solicitation reads, "The prices in this offer have not been and will not be knowingly disclosed by the offeror . . . to any other offeror or competitor before . . . contract award." The statement was made when Shah submitted the solicitation on July 8, 1992. As of that date, there is no evidence that Shah had disclosed any price information. He had only proposed doing so the day before. It was not until July 15 that Shah actually disclosed the information. Therefore, only the "will not disclose" portion of the statement is at issue.

By disclosing his bid to a competitor, Shah broke a promise made and certified in the solicitation. As the government concedes, however, a broken promise is not alone a basis for criminal liability under section 1001. Otherwise, as Shah correctly points out, every breach of a governmental contract would be converted into a section 1001 false statement, thus exposing the breaching party to criminal prosecution. To establish a violation, then, the government must prove, among other things, that the statement "I will not disclose price information before the contract award" was false *when made*. Shah contends that this statement can be neither true nor false when made because it is simply a *prediction* of future performance. As such, the statement is either true or false only after the promise is carried out or broken. The government, on the other hand, argues that this statement clearly implies and manifests an intent which itself may

8

render a promise true or false when made and which may be proved by circumstantial evidence of Shah's state of mind. According to the government, if Shah all the while intended to disclose price information, but nevertheless promised not to, he made a false and fraudulent statement to GSA in violation of section 1001.

To support its argument, the government cites two cases from other circuits, *United States v. Hartness*, 845 F.2d 158 (8th Cir.), *cert. denied*, 109 S.Ct. 308 (1988), and *United States v. Mandanici*, 729 F.2d 914 (2d Cir. 1984). In *Hartness*, the defendant argued that he could not be prosecuted under section 1001 for making a false projection of future income because a projection, when made, is neither true nor false. *Hartness*, 845 F.2d at 160. Although the issue posed in *Hartness* is identical to that here, the facts are somewhat different. There, projections of income on an application to the Farmers Home Administration were governed in part by objective criteria, by facts then in existence: namely, the amount of current income.[8] *Id.* The court recognized that a wrong prediction, standing alone, cannot support liability under section 1001: "No one can be prosecuted for failing to accurately predict the future." *Id.* The existence of verifiable facts in the projection equation, however, distinguished the defendant's statement from a pure prediction and made his prosecution that much less problematic. *Id.* at 160-61. *Hartness*, therefore, is different from the case at hand, in which the truth or falsity of

---

[8]    In *Hartness*, the defendant had based the projection on full-time employment even though the applicant, a full-time college student, had then worked only part time.

9

Shah's statement is not so readily or objectively discernible.

Mandanici is more persuasive. There, the defendant was convicted of making the following two false statements: (1) that the estimated price of some renovation work was $88,000 and (2) that he would do $88,000 worth of work. *Mandanici*, 729 F.2d at 916-17. The government claimed that these two statement were false when made. According to the government, the first statement was false because, at the time it was made, the defendant knew the work would not cost that much. *Id.* at 919-20. The court found insufficient evidence to support that charge because the evidence at trial addressed only the defendant's intention not to carry out the work and not his knowledge of the costs. Because there was no evidence on the record from which a juror could find that the work, if performed, would cost anything other than $88,000, the court reversed the conviction on this count. *Id.* at 920.

The court, however, upheld the conviction on the second count. *Id.* The second statement was a promise to do $88,000 worth of workSQin other words, to do the renovation work that was the basis of the price estimate. According to the charge, when the defendant made this statement, he actually did not intend to do $88,000 worth of work. *Id.* The circumstantial evidence in support of this charge included a letter indicating completion of the work and false documentation of expenditures, both submitted *after* the statement was made. *Id.* Based on this "ample" evidence, the court agreed that the defendant had "falsely represented his intentions" and upheld the conviction. *Id.* Shah asserts that *Mandanici* (like *Hartness*) is distinguishable because the false statement at issue

10

there was "intrinsically intertwined" with the price estimation, a verifiable fact. That fact, however, was assumed true in *Mandanici*, and its accuracy had no bearing on whether the defendant had misrepresented his intentions to perform the renovation work fully. In short, had the defendant done the work promised, there was no reason to suspect that the price would be any less or more than the $88,000 estimated. Nonetheless, Shah is correct that, in focusing on the sufficiency of the evidence, the Second Circuit presumed precisely what is at issue in this case: whether a promise to perform can ever violate section 1001.

Although it is true that *Mandanici* does not explicitly support the government's argument, Shah too fails to cite authoritative support for his contention that a promise cannot be false and thus the basis of prosecution under section 1001. Shah relies on *Williams v. United States*, 102 S.Ct. 3088 (1982).[9] In *Williams*, the Supreme Court considered whether an insufficient funds check could be considered a false statement within the meaning of 18 U.S.C. § 1014.[10] Although the government argued that a check stated that the drawer had sufficient funds in the bank, the Court rejected this reading. The checks were, according to the Court, not technically statements at all; they "served only to direct the

---

[9] Shah also cites *United States v. Glover*, 25 F.Cas. 1339 (C.C.D.C. 1831). In *Glover*, the court held that a "promissory oath cannot be the subject of an indictment for perjury," which holding probably restates what the government does not dispute: that to break a promise does not make the promise false when made. In any event, *Glover* is too cursory to be helpful. Over 160 years old, the decision is exactly two sentences long, and the context of the holding is unclear.

[10] Section 1014 prohibits making a false statement to a bank.

11

drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts." *Williams*, 102 S.Ct. at 3091. This, according to the Court, was the only "meaning" of a check. *Id.* at 3092. The Court noted, moreover, that the government's interpretation of a check's meaning did not necessarily comport with common understanding: "[I]t would be equally plausible to suggest that . . . the drawer will have sufficient funds deposited in his account by the time the check clears, or that the drawer will make good the face value of the draft if it is dishonored by the bank." *Id.* at n.7.

Like *Mandanici*, *Williams* does not directly confront the issue presented in this case. Simply put, the issue in *Williams* was whether a check makes a statement at all and, if so, what statement. Although the Court could not agree with the government about what exactly a check implicitly represents, there is no dispute in this case as to what Shah stated and thereby clearly implied. Contrary to Shah's suggestion, the Supreme Court did not hold that a check was a promise and therefore not a statement. *Williams* neither mentioned nor pursued a distinction between statements and promises. The Court never suggests that a promise cannot, as a matter of law, be or contain a statement or representation. Instead, a check is not a statement because it is not "a factual assertion," because it does not "make any representation as to the state of petitioner's bank balance." *Id.* at 3091. By relying on *Williams* for the proposition that a promise is not a statement, Shah begs the very question at issue: whether

12

the statement at hand is capable of being termed true or false; whether, in other words, a promise can be construed as "a factual assertion."

Finally, the holding in *Williams* must be considered in context; the Court was obviously troubled by the government's characterization of a check's meaning and feared that such an interpretation would expose anyone who bounced a check to federal criminal liability. *Id.* at 3092. This concern mirrors Shah's suggestion that the government's interpretation of false statement or representation under section 1001 would criminalize every broken promise. The government, however, makes no such contention here. *It is not breaking a promise that exposes a defendant to criminal liability, but making a promise with the intent to break it.* Whereas breaking a promise cannot retroactively render the promise false when stated, generally the making of a promise will necessarily imply an intent to perform, the absence of which may itself make a promise false when stated.

This distinction is critical. In the present context, the statement "I will not disclose prices" is something more than a prediction; it clearly contains a necessary implication, signified by the phrase "I will," that the maker intends to do what he promises. *See Restatement (Second) of Torts* § 530(1) cmt. c ("Since a promise *necessarily* carries with it the implied assertion of an intention to perform it follows that a promise made without such an intention is fraudulent . . . .") (emphasis added). The implication is necessary because the statement's meaning depends on it. In the setting of this case, the statement "I will not

13

disclose prices, but I intend to disclose prices" is nonsense because the second clause negates the communicated meaning of the first.[11]

That a promise can inherently be false when made is supported by case law not cited by either party. In *Elmore v. United States*, 267 F.2d 595 (4th Cir.), *cert. denied*, 80 S.Ct. 82 (1959), the defendant was convicted of making false statements and representations on an application to the Farmers Home Administration in violation of the Commodity Credit Corporation Act, 15 U.S.C. § 714m(a).[12] The defendant purchased surplus wheat from the government on the condition that the wheat be used only to feed livestock or poultry. *Id*. at 602. Although the defendant certified as much, the wheat was later used for other purposes. Following his conviction, the defendant argued that "false statements" should be confined to "false statements of existing fact":

> "Since the statements by the defendant in regard to the 4200 bushels of wheat purchased . . . were not statements of facts but promises as to the future use of the commodity, it is said that he committed no crime. . . . It is said that if Congress had intended to make false

---

[11]    We cannot ignore the plain but implicit meaning of the promise. In *United States v. Clark*, 546 F.2d 1130, 1134 (5th Cir. 1977), the defendant submitted a form on which he had made a written statement assigning payments "said to be due" to a third party even though that third party was due nothing. Though the statement on the form was thus literally true, we went beyond these words to consider what the defendant in effect represented, namely, that he had something to assign. *Id. See United States v. Thomas*, 593 F.2d 615, 620 n.17 (5th Cir. 1979) (ruling that the statement was in effect false even if literally true), *cert. denied*, 101 S.Ct. 120 (1980).

[12]    Section 714m(a) prohibits the making of false statements for the purpose of influencing the Commodity Credit Corporation.

promises as to the future a criminal offense . . . ., it would have made express provision therefore as it did in 18 U.S.C. § 1341 [the mail fraud statute] . . . ." *Id.* at 603.

The court rejected this argument and read the statute to cover "false and fraudulent promises which the maker does not intend to perform." *Id.* In terms of frustrating the purpose of the act, the court could see no practical difference between false statements and false promises:

> "[I]t cannot be supposed that Congress intended to direct the criminal sanctions of the act only against those who make false statements of existing fact and to exculpate those who should obtain surplus commodities by making false promises which they do not intend to fulfill. In practical effect, *a false promise fraudulently given amounts to a false statement of an existing intent* and it can be as destructive as the false statement of a material fact. We think Congress intended to cover it by the statute." *Id.* (emphasis added).

In so holding, the court noted that other courts had taken similar approaches to the Selective Service and Training Act of 1940, the Home Owners' Loan Corporation Act of 1942, and the False Claims Act, the statute at issue in this case.[13]

As the Fourth Circuit recognized in *Elmore*, there is a series of cases in which this Court has upheld convictions for making false promises in violation of section 1001. All these cases involve applications by veterans for a Home Loan Guaranty, in which the veterans had to certify that the loans were for the purchase of

---

[13] The court cited *Todorow v. United States*, 173 F.2d 439 (9th Cir.), *cert. denied*, 69 S.Ct. 1169 (1949), in which the defendant was convicted of falsely promising in an application to purchase surplus army trucks that the trucks were for his own use and not for resale. The court did not, however, discuss the distinction between promises and other statements, but simply held that there was sufficient circumstantial evidence that the defendant's representation was false when made.

15

a home.  In *Corcoran v. United States*, 229 F.2d 295, 297 (5th Cir. 1956), for instance, the defendant was charged with causing to be made a promise to use loan proceeds for the purchase of a home when the applicant "did not intend to occupy the said property as his home."  The Court upheld the conviction, noting that if the Veterans Administration had known that the applicant never intended to so use the funds, the loan would have been rejected.  *See also McClanahan v. United States*, 230 F.2d 919 (5th Cir.) (upholding the conviction of an accomplice who caused to be made such statements of purpose where applicant had no real intent to occupy the premises), *cert. denied*, 77 S.Ct. 33 (1956); *Russell v. United States*, 222 F.2d 197 (5th Cir. 1955) (same).  Although in all of these cases this Court termed the statement of purpose "false," we never explicitly discussed a distinction between statements of existing fact and those of future performance, as the Fourth Circuit did in *Elmore*.  *See also United States v. Elliott*, 771 F.2d 1046, 1050 (7th Cir. 1985) (upholding conviction of the defendant-applicant where defendant claimed he had changed his mind after filling out the application).

Albeit implicit, this Court's assumption in prior cases that a promise can be a false statement is supported by the common law of fraud.  Although "[i]t is a general rule that fraud cannot be predicated upon statements which are promissory in their nature at the time they are made and which relate to future action or conduct," 37 *Am.Jur. 2d*, Fraud and Deceit, § 60, it is also generally accepted, under common law principles, that

"fraud may be predicated on promises made with a present

16

intention not to perform them or, as the rule is frequently expressed, on promises made without any intention of performance . . . . The gist of the fraud . . . is not the breach of the agreement to perform, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact nonexistent. . . . The generally accepted modern theory categorizes a promise which the promisor does not intend to carry out, as a misstatement of material and subsisting fact." *Id.* § 68 (footnotes omitted).[14]

Furthermore, "[a] person's statement that he intends to do something when he has no present intention of doing it is a false statement of an existing fact, because it falsely represents the state of his mind, and the state of his mind is a fact." *Id.* § 64 (footnote omitted). *See also Restatement (Second) of Torts* § 530(1) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention"). This common-law understanding of fraud comports with the words and purpose of section 1001.

Nevertheless, at oral argument, Shah argued that the terms of section 1001 should not be read to cover promises. Shah relies on the principle of *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another), based on the absence of the word "promises" in section 1001, as compared to its

---

[14] Generally, "there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed." *Id*. (footnote omitted). *See also id*. § 478; *Restatement (Second) of Torts* § 530(1) cmt. d. However, where the nonperformance is coupled with other probative factors, such as "where only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances," an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred. 37 *Am. Jur. 2d*, Fraud and Deceit, § 478 (footnotes omitted).

17

presence in the mail, wire, and bank fraud statutes.[15]  We reject this argument for two reasons.  First, as mentioned before, a promise to perform is not only a prediction, but is generally also a representation of present intent.  Promises and representations are simply not mutually exclusive categories.  The plain terms of the statute can therefore be said to cover representations of present intent.

Further, the inclusion of the word "promise" in the mail fraud statute is a "codification" of an old Supreme Court case, in which the Court held that the absence of the word "promise" in the statute did not prevent prosecution for making a promise without any intention of performance.  In *Durland v. United States*, 16 S.Ct. 508 (1896), the defendant was convicted of fraudulently promising to issue bonds, which amounted to a "scheme or artifice to defraud" in violation of the statute.  The defendant argued that, under the common law of false pretenses, "fraud . . . must be the misrepresentation of an existing or past fact, and cannot consist of the mere intention not to carry out a contract in the future."  *Id.* at 511.  Without delving into common law principles, the Court rejected this contention, construing the statute to "includ[e] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future."  *Id.*  A promise, the Court concluded, can be as fraudulent as a statement of present fact if the promisor never intended to

---

[15]   These statutes prohibit "any scheme or artifice to defraud," as well as schemes for obtaining money or property by "false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343, 1344.

18

perform.  *Id.*  According to the Court,

> "If the testimony had shown that . . . the defendant . .
> . had entered in good faith upon that business, believing
> that out of the moneys received they could, by investment
> or otherwise, make enough to justify the promised
> returns, no conviction could be sustained, no matter how
> visionary might seem the scheme.  The charge is that, in
> putting forth this scheme, it was not the intent of the
> defendant to make an honest effort for its success, but
> that he resorted to this form and pretense of a bond
> without a thought that he . . . would ever make good its
> promises.  It was with the purpose of protecting the
> public against all such intentional efforts to despoil,
> and to prevent the post office from being used to carry
> them into effect, that this statute was passed; and it
> would strip it of value to confine it to such cases as
> disclose an actual misrepresentation as to some existing
> fact, and exclude those in which is only the allurement
> of a promise.  This, which is the principal contention of
> counsel, must be overruled."  *Id.*

The Supreme Court has recently recognized that the congressional inclusion of the word "promise" in the mail fraud statute is, in a sense, a redundancy, a "codification" of existing case law. *McNally v. United States*, 107 S.Ct. 2875, 2880-81 (1987).

For the foregoing reasons, we reject Shah's contention that a "promise to perform" cannot, as a matter of law, ever violate section 1001.  We hold that, under section 1001, a promise may amount to a "false, fictitious or fraudulent" statement if it is made without any present intention of performance and under circumstances such that it plainly, albeit implicitly, represents the present existence of an intent to perform.[16]

---

[16]     Shah contends the trial court erred in refusing the following instruction:

> "You are instructed that you cannot convict unless
> the facts that you find to be false beyond a reasonable
> doubt occurred before the making of the statement
> containing those facts, and, further, that the
> defendant knew that the facts were false."

19

In the present setting, it is clear that the statement or promise implicitly represents Shah's present intent. We now determine whether the government proved falsity in this case. Shah claims, in his first evidentiary point, that the evidence was inadequate to support the necessary premise that Shah had no intention of carrying out the promise when he made it. We view the evidence in the light most favorable to the jury verdict and will affirm if a rational trier of fact could find that the government proved all essential elements of the crime beyond a reasonable doubt. *United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994). As mentioned earlier, whether a defendant intended to perform is a question of fact concerning the defendant's state of mind. The mere fact of subsequent nonperformance is not alone sufficient for conviction. *See* note 14, *supra*. Although the call is a close one, we cannot say that the circumstantial evidence in this case was insufficient to justify the verdict. Courts have routinely relied on circumstantial evidence to support such false-promise determinations. *See Corcoran*, 229 F.2d at 297; *Elliott*, 771 F.2d at 1050; *Mandanici*, 729 F.2d at 920; *Todorow*, 173 F.2d at 443-44.

Because this proposed instruction at best confusingly states the law, the district court was right to refuse it. *United States v. Linn*, 889 F.2d 1369, 1371-72 (5th Cir. 1989), *cert. denied*, 111 S.Ct. 43 (1990). The relevant facts must be false when the statement is made, not before or after that time. Furthermore, to the extent the proposed instruction was based on the assumption that a promise cannot be false, it was mistaken and confusing. The district court correctly charged the jury that it must find that "the defendant made the statement intentionally knowing that it was false" in order to convict Shah. The court went on, "A statement is false if it was untrue when made and then known to be untrue by the person making it." This instruction represents a correct and adequate statement of the law.

20

*See also* note 14, *supra*.

At the end of the first conversation, Kipper was "non-committal," and Shah left his telephone number. From these facts, a jury could infer that the matter was not abandoned, but was rather left open. That Shah submitted his bid before actually exchanging the information does not invalidate this inference. When he submitted his offer, Shah was aware that the bids could be changed up until the contract award. Indeed, he stated as much in his initial exchanges with Kipper during their first monitored conversation on July 15. Further, although Shah did not reinitiate further contact after their conversation on July 7, when Kipper called a few days after the submission of the bids, Shah was immediately receptive to his earlier suggestion and wasted no time arranging an exchange of bid information. During this conversation, which occurred so shortly after Shah's July 8 statement, Shah neither expressed surprise at Kipper's broaching the subject nor treated it as an about-face. Shah certainly intended to exchange price information on July 7 and July 15; under the evidence, the jury could infer that he had the same intention on July 8. In short, the evidence introduced at trial as to events both before and after the submission of Shah's offer supports the jury's verdict.

Shah also claims that the government failed to prove that the Nitin Shah who submitted the bid and exchanged the price information was the Nitin Shah who was arrested. This contention is without merit. Given that the GSA agent who arrested Shah testified that he found Shah at the address listed on the bid as

21

that of Omega Electronics and that the Nitin Shah arrested was the only Nitin Shah living at that address, the only logical interpretation of the evidence at trial was that the Shah who was arrested was the one who committed the crime. There was nothing whatever to suggest the contrary. The government need not make a case for identity air-tight; identity may be inferred circumstantially, and the ample circumstantial evidence in this case pointed in only one directionSQtoward the defendant. *See United States v. Royals*, 777 F.2d 1089, 1091 (5th Cir. 1985).

We must likewise reject Shah's final evidentiary claim: that the government failed to prove that Shah actually read the certification and thus made his statement "knowingly." As a party to prior supply contracts with GSA, Shah was not new to the bidding process or to the GSA's forms. Further, Shah filled in information both below and above section 13, the section at issue. Shah supplied requested information in over sixty separate locations throughout the solicitation, including his signature in four places. Finally, Shah's request for confidentiality suggests that he knew of the certification. Nothing suggests that he did not. A jury could infer beyond a reasonable doubt that Shah read and understood what he signed and submitted. *See Puente*, 982 F.2d at 159; *see also United States v. Munna*, 871 F.2d 515, 517 (5th Cir. 1989), *cert. denied*, 110 S.Ct. 871 (1990).

Finally, we find no support for Shah's contention that there was an impermissible variance between the indictment and the proof at trial. The basis for this claim is the omission in the indictment of the two parenthetical phrases contained in the actual

22

statement in the solicitation:  that prices will not be disclosed before bid opening "(in the case of a sealed bid solicitation)" or contract award "(in the case of a negotiated solicitation)."[17]  Shah claims that, by omitting this parenthetical language, the government relieved itself of the obligation of proving what bid arrangement was at issue and whether there had been a contract award or bid opening at the time the statement was made.  However, to constitute reversible error, there must be not only a variance, but a *material* one.  *United States v. Moree*, 897 F.2d 1329, 1334 (5th Cir. 1994) ("A mere variance in language between proof and the explicit language of the indictment which does not constitute the modification of an essential element of the offense charged is not error.").  It is not essential that the government, in the indictment, set up verbatim the factual bases for its allegation of falsity, so long as the facts to be proved are implicit in the allegation.  *Id.*

To be material, the variance must "prejudice[] the defendant's 'substantial rights,' either by surprising the defendant at trial or by placing the defendant at risk of double jeopardy."  *United States v. Robinson*, 974 F.2d 575, 578 (5th Cir. 1992).  Here, the

---

[17]    The indictment describes the relevant false statement as follows:  "[t]he prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening or contract award unless otherwise required by law."  The statement contained in the solicitation, which was admitted in evidence at trial, reads as follows:  "The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law."

23

variance is immaterial because it did "not impair the defendant's ability to defend himself through failing to identify the nature of the charge." *Id.* (citation and quotation marks omitted). Because Shah was at all times fully aware what provision of the bid was the basis for the indictment, he cannot credibly claim surprise. *United States v. Arlt*, 567 F.2d 1295, 1298 (5th Cir.) (finding no prejudice where the indictment incorrectly identified the form upon which defendant allegedly made a false statement because defendant was in any event aware what statement in the actual form the government was relying on), *cert. denied*, 98 S.Ct. 2250 (1978). Because Shah has failed to show that the variance was material, we reject this final contention.

## Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.