**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James R. ELLIOTT,
Defendant-Appellant.**

No. 84–2289.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 24, 1985.

Decided Aug. 26, 1985.

John T. Theis, Chicago, Ill., for plaintiff-appellee.

Robert B. Breisblatt, Asst. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, PELL, Senior Circuit Judge.

CUDAHY, Circuit Judge.

James Elliott has been licensed as a real estate broker in Illinois since 1978. He is evidently an aggressive and successful real estate salesman; but the government, offended by certain strategies he adopted in 1980 and 1981, and thinking that his aggressiveness had taken him beyond the limits of propriety, brought him into federal district court on ten counts of mail fraud and nine counts of making false statements to government agencies. The jury, equally unsympathetic to Elliott's sales strategies, found him guilty on all nineteen counts, and the district judge sentenced him to a year and a day in prison on the mail fraud counts, to run concurrently, and five years probation on the rest, to run consecutively to the period of incarceration.

I.

F.H.A. and V.A. loans are intended to make home purchases possible for buyers who might not otherwise be able to finance their own homes. Both programs guarantee the mortgage, at least to some extent, and both make possible smaller down payments. The V.A. loans are intended for veterans. For the particular loans in question here, the borrower must promise to occupy the home he purchases. For investors the F.H.A. has another sort of program requiring a larger down-payment. Although the V.A. program requires occupancy by the veteran making the loan, the veteran's mortgage can later be assumed by another buyer; the veteran would remain liable for the mortgage.

At trial, the government claimed that in order to increase the number of homes he had sold—and consequently his commission—Elliott devised a scheme whereby he would take advantage of V.A. and F.H.A. loan programs to get the benefit of financing to which he was not entitled. Nine transactions were involved, and the details of the scheme varied from transaction to transaction.

On March 14, 1980, Elliott entered into a real estate contract with Mr. & Mrs. Lee to purchase from them their home at 117 Lee Lane, in Bolingbrook. This purchase was intended to allow the Lees to buy another home from Elliott. Elliott made a $7,000 commission on this purchase from the Lees; he paid for the house with an F.H.A. approved loan. On May 29, 1980 he signed a "firm commitment" with the F.H.A. indicating that he would be the occupant; by July 22 of that year he had the property

rented.[1] He testified at trial that he had intended to occupy the property, and could not remember what changed his mind.

On April 22, 1980, Elliott signed a contract to sell to Don Wasmund one of the homes he owned, the one at 217 Bedford Lane in Bolingbrook. Wasmund testified that he had never been inside the house; he signed the application for a V.A. loan guaranty, he said at trial, because Elliott promised to give him $1,000 and to take over the loan after the closing. Wasmund signed a "Veteran's Certification" on June 24, certifying his intention to occupy 217 Bedford. On November 13, 1980, he signed a deed giving the property back to Elliott. Elliott made $8,500 profit on the sale, and $4,500 in commissions. Elliott testified at trial that Wasmund had told him that he intended to move in, but changed his mind when he broke up with his girlfriend.

Elliott entered into many such transactions in this period. Unable to sell a home for Mr. & Mrs. Wynn, he had Mr. Wynn (a veteran) refinance the mortgage through the V.A., saying that he intended to continue occupying the property. The Wynns used the money to buy a new home, for which Elliott got a commission, and Elliott took over the payments on their old home under a land contract.[2] He had Mr. & Mrs. Krall refinance their mortgage through the V.A.; although they certified on the application their intention to continue to occupy their home, they used the money as a down payment on a home owned by Elliott, and Elliott bought their old home. Elliott made a profit and a commission on the sale of the house he owned to the Kralls. On the sale of the Krall's house to Elliott, the Kralls paid him a commission of $3,500. The V.A. mortgage on the old Krall home went into default in 1983; the V.A. lost $11,000.

Robert Elliott, James' father, took out a V.A. loan to purchase a house through James, certifying that he would occupy it. James Elliott had it rented eight days after the closing, and he bought it back from his father three months later. The V.A. lost $22,000 in 1983 when the loan went into foreclosure. Evidence at the trial revealed that James had signed his father's name to the contract of sale and signed the name of J.F. Lanners as his father's employer on a verification of employment. Elliott made a commission of $9,000 on this sale.

Paul Kopchak took out a V.A. loan to buy a house, certifying his intent to occupy, but never moved in. Elliott got a commission and later bought the house from Kopchak. The V.A. lost $11,000 on the property in 1983. The Tyrees refinanced their home through the V.A., certifying that they would continue to occupy it, and used the money to buy a new home through Elliott. Elliott bought their old home a few months later. He made a commission on each sale. The V.A. lost $15,000. John Infanti also bought a new house through Elliott and sold him his old one. Infanti had refinanced the old one through the V.A., certifying his intent to occupy, *after* moving out. Again Elliott made a commission on each of the sales. The V.A. paid off on its guaranty in 1983, losing $24,000.

Finally, on April 1, 1981, Elliott had his sister and her husband obtain an F.H.A. loan, certifying that they would occupy the property to be purchased. A few days after closing, they deeded the property to Elliott; they never moved in. He made a commission of $3,300. The F.H.A. lost $46,000 when the property went into foreclosure.

All of these events took place between March 1980 and April 1981, except for the foreclosures, which by and large took place in the first half of 1983. At trial Elliott

---

1. There was other misinformation on the F.H.A. application; Elliott gave as his address one at which he no longer lived. He failed to list three other homes that he owned at the time of this purchase. The property at 117 Lee Lane went into foreclosure in 1983; the F.H.A. lost $15,000 on the deal.

2. This transaction was not the basis of a separate substantive count, but was alleged as part of the mail fraud.

insisted that in every case he had acted in good faith, and that the false information supplied to the V.A. and the F.H.A. was due either to inadvertence or to the fault of others. He argues on appeal that there was insufficient evidence to support a scheme to defraud; that there is no evidence that he made false statements to government agencies; and that the district judge made various errors at trial.

## II.

■ The mail fraud provision of the federal criminal code, 18 U.S.C. § 1341, says in part:

Whoever, having devised or intending to devise, any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses..., for the purpose of executing such scheme, ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... or knowingly causes to be delivered by mail according to the direction thereon ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The essential elements of a mail fraud prosecution are a scheme to defraud and the use of the mails to execute or further this scheme. *United States v. Shelton,* 669 F.2d 446 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). Elliott does not contest the use of the mails; rather he argues that a scheme to defraud was not established.

■ Our review of a jury verdict is limited; if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt, we are bound to affirm the verdict. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The question here is whether a rational juror could have found a scheme to obtain "money or property by false or fraudulent pretenses."

James Elliott could only collect his commissions by selling houses. The evidence presented at trial was overwhelming; he gave the government false information, and had others give false information, so that they might receive government-backed loans. Neither Elliott nor the others who took part in the schemes were entitled to the loans; the loans were essential to the sale of the houses. The transactions followed several patterns, some of them fairly complicated.

■ But Elliott argues that he always acted in good faith, and at no time intended to defraud the government. It may be enlightening to review a few of the individual transactions.

(1) Elliott claims that when he purchased 117 Lee Lane with an F.H.A. loan, he intended to occupy it. However, his application for the loan did not include requisite information about other properties he owned—information that might have led the F.H.A. to question his intention to occupy the Lee Lane house—and Elliott gave a false address. Elliott never had the utilities hooked up in his own name, never moved in and entered into a contract to rent the property less than sixty days after the purchase.

We think that, faced with this evidence in isolation, a rational juror might draw the conclusion that Elliott never intended to occupy the property. The jury was not faced with this evidence in isolation, though; and given the evidence of the other transactions we think that a rational juror would have had difficulty justifying a determination of good faith.

(2) Wasmund testified at trial that he had no intention of moving into Elliott's property at 217 Bedford, and that Elliott promised him $1,000 to use his V.A. eligibility. Wasmund had been promised immunity, as the jury knew, for his testimony. The jury was entitled to find Wasmund more credible than Elliott; for one thing, Elliott repurchased the property less than five months later, and in the interim the utilities had never been changed from Elliott's name into Wasmund's name.

(3) When the Kralls refinanced their home through the V.A., with Elliott's help

and guidance, Elliott could not have been unaware that the Kralls had no intention of remaining in the refinanced home—he had sold them another home with the proceeds. We think that the jury might reasonably have deduced a scheme to defraud from the evidence.

It is unnecessary to review all of the evidence of the other transactions. The jury was certainly justified in finding a scheme to defraud. And for many of the same reasons, the jury was justified in finding that Elliott had made false statements to government agencies. Unless the jury was prepared to believe that there was a flurry of unrelated frauds perpetuated by members of the Bolingbrook community in 1980 and 1981, all of whom made false statements to government agencies, and all of whom, by mere chance, did business through Elliott, who innocently offered to purchase their homes after the sale in each case, there is very little it could have done, other than to find that Elliott was instrumental in causing the false statements to be made.

■ Section 1001 of Title 18 of the United States Code makes it a crime to knowingly make false statements in a document intended for use by a government agency. Together with the general aiding and abetting provision of the criminal code, 18 U.S.C. § 2, section 1001 also makes it a crime to cause such a false statement to be made. Elliott contests his conviction on each of the nine counts of making false statements. It will suffice to review just a few of those counts.

(1) As to his own F.H.A. loan for 117 Lee Lane, Elliott contends that his testimony that he intended to occupy the property was uncontradicted. We have already seen that the jury was justified in finding that that statement was false.

(2) Wasmund testified that Elliott knew he had no intention of occupying Elliott's house. Before he was given immunity, Wasmund had told the F.B.I. that he had so intended, but had changed his mind. At trial he admitted that he had originally lied to the F.B.I. Elliott contends that his testi-

mony cannot support a conviction on this count: "The uncorroborated testimony of a person who admits making a false statement concerning the events about which he is testifying to cannot support a conviction on that count...." Appellant's Brief at 21. But he offers no authority for that proposition, and for our part we do not believe that it is correct. The point of introducing inconsistent statements is to impeach; it is in the jury's province to determine whether the witness remains credible.

(3) Elliott argues that there was "absolutely no testimony" to support the assertion that Elliott induced his father to make false statements. It was established at trial that Elliott signed both his father's name and his father's employer's name to agency forms. He claimed to have the employer's permission, but there was no corroborating testimony from the employer.

Again, we think that, on the evidence for any one of these counts in isolation, a jury might have been justified in drawing conclusions either of innocence or guilt; taken as a whole, however, the evidence would surely make it difficult for a reasonable jury to avoid finding a scheme to defraud, and nine separate instances of making or causing to make false statements to government agencies.

### III.

■■ Elliott complains of a number of errors that he claims were made at trial. He claims that he was prevented from preparing his defense by the trial court's denial of a bill of particulars. The trial court examined Elliott's request and determined that nothing would be gained by granting the motion. Elliott had asked for a list of regulations he was supposed to have broken; there had been no allegation that he broke any regulations. He had asked for a list of false statements that were supposed to have been made; but the indictment was specific about those statements, even if it

did not quote them.[3] In any event, whether or not to grant a bill of particulars is within the discretion of the trial judge. *Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *United States v. Kendall,* 665 F.2d 126, 134–35 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). It is clear in this case that the information defendant sought, insofar as such information existed, was provided in the indictment.

■ Elliott also complains of several evidentiary rulings. First he argues that the government should not have been allowed to introduce evidence of V.A. and F.H.A. losses. The basis of this claim is evidently the proposition that to prove mail fraud it is not necessary to prove any actual losses; since actual losses are not necessary, he argues, their introduction can only prejudice the defendant. While it is true that actual losses are not necessary, *United States v. George,* 477 F.2d 508, 512 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973), we think the rule is a permissive one: if there *are* actual losses, they may be proved. We know of no authority for the contrary proposition, and defendant does not cite any.

■ Elliott tried to introduce evidence of a prior inconsistent statement Wasmund had made to his superior about Wasmund's reason for not moving into the house he had bought. The court properly excluded the superior's testimony on the ground that Wasmund had not been questioned about the remarks made to his superior. Fed. R.Ev. 613(b).

■ And finally Elliott complains that he was not allowed to introduce a listing book that would have shown, he says, that the government could have gotten more for the houses sold when Elliott defaulted on the mortgages. In particular the house at

117 Lee Lane apparently sold, in 1984, between private parties, for more than the government had sold it for. The district judge excluded this information as hearsay for two substantive reasons—the listing book did not indicate whether any changes had been made in the property between 1983 and 1984 (she made it clear that she would allow evidence on this point from someone familiar with the property); and because market conditions changed radically between the government sale in 1983 and the private sale in 1984. We do not believe that the district judge abused her discretion in excluding this evidence; since an actual loss need not have been shown to establish mail fraud, it is not relevant that the actual loss is one the government need not have sustained. It suffices to prove the scheme.

For all these reasons, the defendant's conviction is affirmed.

caused to be filled out a Veterans Administration Application ... wherein John Infanti represented that he owned and personally occupied as his home 211 Plymouth, Bolingbrook, Illinois, whereas in truth and fact ... [etc.]

---

**3.** For example, Count Sixteen reads, in part:
On or about June 24, 1980...
James Elliott
... knowingly and wilfully did cause to be made by John Infanti false, fictitious and fraudulent statements ... in that defendant