In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2816

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAURANCE H. FREED,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 00951 — **Robert M. Dow, Jr.**, *Judge.*

ARGUED FEBRUARY 7, 2019 — DECIDED APRIL 22, 2019

Before BAUER, HAMILTON, and BRENNAN, *Circuit Judges*.

BAUER, *Circuit Judge.* It appears that Laurance Freed did everything he could to keep his real estate business alive. Unfortunately for Freed, much of that was illegal. Freed lied to prospective lenders about the availability of collateral and to ensure those lenders remained in the dark about numerous defaults, he lied to the City of Chicago. The government also

proved that Freed entered into loan agreements with no intention of abiding by their terms. We affirm Freed's convictions for bank fraud (18 U.S.C. § 1344); mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); and making false statements to a financial institution (18 U.S.C. § 1014) .

## I. BACKGROUND

Laurance Freed was the president and chief executive officer of Joseph Freed and Associates ("JFA"), a real estate development company. Freed also created and managed several real estate ventures including Uptown Goldblatts Venture, LLC ("UGV"). UGV was responsible for developing a building in the Uptown neighborhood and secured tax increment financing ("TIF") from the City of Chicago to fund the project in 2002. Tax increment financing is a mechanism for funding projects approved by the Chicago City Counsel. After identifying a region in need, the city assesses the property taxes collected in that area and freezes the determined amount in place. Taxes collected in subsequent years that exceed that amount are funneled into the TIF program. The city issued two TIF notes that entitled UGV to the payment of TIF funds: a redevelopment note for $4.3 million and project note for $2.4 million. UGV was required to file an annual requisition form with the city that certified, among other things, it was not in default on any loans and it had not entered into any transactions that would harm its ability to meet its financial obligations. If any event of default occurred, the city would be discharged of its obligation to provide UGV with TIF payments.

Freed obtained a loan from Cole Taylor Bank in 2002 that was secured in part by the $2.4 million project note. This agreement provided that attachment of any security interest or lien to the collateral used to secure the loan would constitute an event of default.

In 2006, two other Freed entities entered into a loan agreement with a bank consortium for a $105 million line of credit. The parties referred to this as "the big line of credit," as shall we. To secure this loan they pledged as collateral properties known as the Evanston Plaza and the Streets of Woodfield, and Freed personally guaranteed $50 million of the loan. UGV subsequently entered into an agreement to become a borrower under the big line of credit and pledged the $2.4 million project note as collateral. UGV represented that it owned the note free of any encumbrances despite the fact that the TIF note was already pledged to Cole Taylor. In August 2008, a representative from Cole Taylor sent an email to Freed reminding him the project note was collateral in their still-outstanding 2002 loan. Freed forwarded this email to JFA's lawyer who informed him that the project note was double-pledged—once to Cole Taylor and once for access to the big line of credit. This constituted an event of default under the Cole Taylor loan agreement.

By fall of 2008, Freed had withdrawn millions of dollars from the Streets of Woodfield to meet the ongoing financial obligations of his various properties and projects. Opposed to this tactic and citing concerns that these withdrawals would leave them unable to meet property tax obligations, the chief financial officer of JFA resigned. JFA failed to make its payment on the big line of credit in November 2008, an event of default on this loan. Approximately $900,000 in taxes were due

on the Evanston Plaza property in November which went
unpaid as well.

Freed sought a $10 million loan modification from a bank
consortium to address these issues. Freed gave presentations
to the bank consortium on December 15, 2008, and January 20,
2009. During these presentations Freed presented slides that
contained three potentially fraudulent statements. The first
indicated that the Streets of Woodfield could serve as collateral
for the loan modification, but failed to explain that approxi-
mately $3.6 million had been withdrawn from the property.
Second, a slide indicated the Evanston Plaza property could
serve as collateral for the loan modification, but failed to alert
the consortium of the $900,000 in unpaid taxes. Finally, a slide
indicated the project note was available to serve as collateral
and worth $2.4 million. In truth, the project note was worthless
to the consortium since it was already serving as collateral for
two different loans. Furthermore, the payments already made
by the city had decreased the value of the project note to $2.1
million.

Bank of America was willing to provide the loan modifica-
tion and Freed signed the agreement on April 2, 2009. The
agreement prohibited withdrawal of funds from the Streets of
Woodfield unless the money that remained with the entity was
sufficient to cover property tax payments and security deposits
for all tenants. When Freed signed the agreement the Streets of
Woodfield had only $19,000 in its reserves, a tax obligation of
around $4 million per year, and several tenants with security
deposits. The next day, when funds were distributed to the
Streets of Woodfield, Freed immediately withdrew $273,000

and in the following weeks made seven withdrawals totaling around $1.3 million.

Shortly thereafter, Cole Taylor sought to amend the UGV loan and discovered the project note had been double pledged. Cole Taylor drafted an amendment that stated Freed would obtain a release of the project note from Bank of America by October 2009. One of Freed's associates at a meeting with Cole Taylor represented that UGV was already in talks with Bank of America to obtain a release. But Freed never discussed the release with Bank of America and they failed to even discover the double pledge until 2010.

The final part of Freed's scheme was the annual requisition forms he provided the city pursuant to the TIF note agreement, which required him to certify UGV was not in default on any loans. Freed claimed none of his entities were in default in signed affidavits he provided the city in December of 2008, 2009, and 2010, in order to continue receiving TIF payments.

A jury convicted Freed on three bank fraud counts, one mail fraud count, and four false-statement counts. On appeal, Freed makes two principal arguments. Freed asserts two jury instructions were incorrect and there was insufficient evidence for several of his convictions. We disagree and affirm.

## II. ANALYSIS

### A. Jury Instructions

Before we reach the merits of Freed's appeal, we must determine whether waiver is appropriate because Freed failed to object to the assailed instructions at the jury instruction conference. Waiver is often the result when a party fails to

object, but recently we have acknowledged the harshness of this rule may be inappropriate if it appears counsel merely "negligently bypassed a valid argument rather than [making] a knowing intentional decision." *United States v. Pust*, 798 F.3d 597, 602 (7th Cir. 2015) (quoting *United States v. Natale*, 719 F.3d 719, 729–30 (7th Cir. 2013)). "The touchstone of waiver is a knowing and intentional decision." *United States v. Al-Awadi*, 873 F.3d 592, 597 (7th Cir. 2017). When it appears a reflexive "no objection" response was given during a rote colloquy with the district court, we may examine the record to determine whether the objection was forfeited rather than waived. *Natale*, 719 F.3d at 730–31. The necessity of review may also arise absent an objection if the jury instruction "inaccurately state[d] the law by minimizing or omitting elements required for conviction." *Id.* at 731.

The record demonstrates that the jury instruction conference was anything but an exercise in the reflexive. The failure to object was not part of a series of call-and-response "no objections," but occurred between in-depth discussions of other instructions. If this is not waiver, appellant has forfeited these arguments and we must review for plain error. Because the defendant could not meet his burden, even under plain error review, we need not decide the waiver issue.

This court will find plain error if the defendant can establish (1) an error or defect, (2) the error is clear or obvious and not subject to reasonable dispute, (3) the error affected substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Navarro*, 817 F.3d 494, 499 (7th Cir. 2015). If the defendant

meets this high bar, this Court, in its discretion, may remedy the error. *United States v. Ajayi*, 808 F.3d 1113, 1122 (7th Cir. 2015); *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

Pattern instructions are presumed to accurately state the law. *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014). Freed assails Seventh Circuit Pattern Jury Instruction § 5.06, which covers the criminal liability of principals codified at 18 U.S.C. §§ 2(a) and (b). *See* Pattern Criminal Jury Instructions of the Seventh Circuit § 5.06, at 64 (2012). The instruction the district court gave mirrored § 5.06(a): "Any person who knowingly aids; counsels; commands; induces; or procures the commission of an offense may be found guilty of that offense if he knowingly participated in the criminal activity and tried to make it succeed."[1]

A person is liable for aiding and abetting a crime if he takes an affirmative act in furtherance of that offense with the intent of facilitating commission of the offense. *Rosemond v. United States*, 572 U.S. 65, 71 (2014) (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994)). Additionally, it is axiomatic that one cannot aid and abet a crime unless a crime was actually committed. *See United States v. Motley*, 940 F.2d 1079 (7th Cir. 1991). Freed latches onto this requirement and asserts the district court's aiding and abetting instruction was deficient because it did not require the jury to find a crime was actually committed. But the district court instructed the jury that the defendant must have "knowingly

---

[1] Section 2(a), states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a).

participated in *the criminal activity*" to be found guilty of aiding and abetting. Transcript at 2162 (emphasis added). The requirement that the defendant knowingly participated in "criminal activity" logically requires underlying criminal activity. Therefore, even though the district court did not explicitly explain an underlying crime was required to support an aiding and abetting conviction, it was sufficiently implied by the instruction.

The "willfully causing" pattern instruction corresponds to 18 U.S.C. § 2(b), which states, "Whoever *willfully* causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." The district court instructed: "If the defendant *knowingly* causes the acts of another then the defendant is responsible for those acts as though he personally committed them."[2] The difference between the use of willfully in the statute and knowingly in the jury instructions is obviously problematic.

However, we find no indication in the record that the jury relied upon the aiding and abetting or the willfully causing instruction. The government did not advance a theory at trial that Freed was assisting in this scheme or willfully causing other people to perform criminal acts in furtherance of his scheme. Rather, the government repeatedly asserted Freed was in charge of the whole operation. They asserted he was the

---

[2]  The district court simply adopted the pattern instructions which include the incorrect *mens rea*. Section 5.06(b) states that "[i]f a defendant knowingly causes the acts of another, then the defendant is responsible for those acts as though he personally committed them."

individual who gave the presentation to the banks with the false information being projected on the slides behind him. The government asserted Freed signed the documents containing falsehoods that were submitted to the city. And they asserted that Freed himself never intended to abide by the promises that he made when he signed the loan modification with Cole Taylor and the amended loan agreement with Bank of America. If the government had argued otherwise the outcome of this case might be different, but Freed's role in the scheme makes it highly unlikely that the instructions had any effect on the jury.

Additionally, the district court laboriously described each element of each crime and stated after each that the government must prove every element, including the correct *mens rea*, beyond a reasonable doubt or a verdict of not guilty must be rendered. This further mitigates the likelihood that the jury believed they could convict Freed for a *mens rea* other than the one described by the district court in detailing the requirements of each substantive offense. *See United States v. Valencia*, 907 F.2d 671, 681 (7th Cir. 1990); *United States v. Brown*, 739 F.2d 1136, 1143 (7th Cir. 1984) (defendant argued that the district court's definition of knowingly negated the specific intent to defraud, but the court held that including the intent to defraud in the elements of the substantive offense was sufficient). We assume juries follow the instructions they are given and nothing in the record indicates this presumption should be discarded. *United States v. Keskes*, 703 F.3d 1078, 1086 (7th Cir. 2013). We find no plain error.

### B. Sufficiency of the Evidence

Freed also argues the government produced insufficient evidence to prove Counts 6, 7, 10, 11, 14, and 16. We conduct this review *de novo* and construe the evidence in the light most favorable to the government. *United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016). A verdict will be overturned on appeal only if "the record is devoid of evidence from which a rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Memar*, 906 F.3d 652, 656 (7th Cir. 2018).

#### i.  Counts 6 and 7

Counts 6 and 7 charged Freed with bank fraud in violation of 18 U.S.C. § 1344 for lying in UGV's annual submissions to the city. Freed argues there was no evidence that he lied to the city in order to defraud the banks. A bank fraud conviction requires the government prove (1) there was a scheme to defraud a financial institution; (2) the defendant knowingly executed or attempted to execute the scheme; (3) the defendant acted with the intent to defraud; (4) the scheme involved a materially false or fraudulent pretense, representation, or promise; and (5) at the time of the charged offense the entity was a "financial institution" within the meaning of 18 U.S.C. § 20. *Shaw v. United States*, 137 S. Ct. 462, 465 (2016); *see also* Pattern Criminal Jury Instructions of the Seventh Circuit & Comment, at 447–48 (2012).

The government produced persuasive evidence demonstrating Freed knew the affidavits he submitted to the city were false. At the time the documents were submitted for 2009 and 2010, UGV had missed several payments on the big line of credit and had been sent multiple notices of default. The

government also presented evidence that Freed knew the project note was double pledged, an event of default for the Cole Taylor loan, which UGV's in-house counsel confirmed. Thus, the falsehood of the affidavits submitted to the city was firmly established.

However, the rub of Freed's appeal lies in how his falsehoods affected the banks. Freed argues that his lies actually benefitted the banks because they allowed UGV to acquire capital to pay them. But what Freed leaves out is that with the city unaware of the defaults, he was able to keep them hidden from the banks and maintain his lie regarding the availability of the TIF notes as collateral. Freed admits that if he had disclosed the defaults "the City would have declared a default under the Uptown Goldblatts redevelopment agreement and refused to make any future payments on the notes. Indeed, this is exactly what happened when the City later became aware of the defaults." But there is no fraud exemption for schemes that benefit one's creditors and Freed's admission shows the truth would have destroyed his scheme. Thus, by suppressing the likelihood that the bank consortium would discover the defaults and ensuring the city did not alert them, Freed was able to lie about the availability and value of the TIF notes as collateral. Because a reasonable juror could find that Freed's lies to the city prevented the banks from discovering his scheme, we affirm the district court's denial of Freed's motion for acquittal on these counts.

### ii. Counts 10, 11

Freed also asserts that the proof of Counts 10 and 11 lacks sufficient evidence demonstrating Freed knowingly made false statements to a banking institution under 18 U.S.C. § 1014. Section 1014 makes it a crime to "knowingly make[] any false statement … for the purpose of influencing in any way the action of … any institution the accounts of which are insured by the Federal Deposit Insurance Corporation." Freed was convicted of Counts 10 and 11 for presenting false information to a bank consortium on December 15, 2008, and January 20, 2009, respectively. Both counts are based on a slide describing the proposed "Line of Collateral" which included representations that UGV owned one hundred percent of the TIF notes, the cost to sell them was $0, and the proceeds of that sale would be $7,698,000. Freed asserts his statements were technically true. However, Freed's representations at these meetings would not naturally be understood as simply stating facts about unavailable collateral, information that would have been useless to the banks. The presentation clearly indicated the project note was available to serve as collateral for the loan modification, a representation that the government proved was false. *See Williams v. United States*, 458 U.S. 279, 296 (1982) (Marshall, J., dissenting) (noting that "the Courts of Appeals have held that the failure to disclose material information needed to avoid deception in connection with loan transaction covered by § 1014 constitutes a 'false statement or report,' and thus violates the statute."). The notes were already double pledged and thus unavailable to serve as collateral. A reasonable juror could find these representations were false.

### iii.    Counts 14 and 16

Counts 14 and 16 involve Freed's fraudulent violation of two loan agreements. The statutory language of § 1014 is capacious; it is cast in broad disjunctive terms because "Congress hoped to protect federally insured institutions from losses stemming from false statements or misrepresentations that mislead the institutions into making financial commitments, advances, or loans." *Williams*, 458 U.S. at 294 (Marshall, J., dissenting); *see also United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998). Freed expounds a restrictive reading of the statute and asserts that agreeing to the covenants within the loan agreements was a nonactionable promise of future conduct. The government's theory at trial was not that Freed eventually broke a promise after agreeing to it, but rather that Freed made a false statement of present intent. Put another way, Freed made a false statement to the bank because he had no intention of abiding by certain provisions of the loan agreement when he signed it.

Whether a promise made with a present intent not to keep it results in criminal liability pursuant to § 1014 is apparently one of first impression in this circuit. Freed principally relies on *Williams*, to establish that promises of future intent cannot be considered false statements under § 1014. 458 U.S. at 285. However, *Williams* cannot be read to mean that promises are categorically beyond the reach of § 1014. In *Williams*, the Supreme Court merely held that checks cannot be considered factual assertions that can be categorized as true or false. *Id.* at 284. *Williams* did not hold, as Freed asserts, that a false promise

cannot be a false statement sufficient to establish criminal liability under § 1014.

We find a case from our sister circuit, *United States v. Shah*, 44 F.3d 285 (5th Cir. 1995), more instructive. In *Shah*, the defendant challenged his conviction under 18 U.S.C. § 1001, which prohibits making a false statement to a government agency with the intent to deceive or mislead. *Id.* at 289. Shah violated an agreement related to government solicitation by disclosing his bid to a competitor before the contract was awarded. *Id.* The court held that "to establish a violation … the government must find … that the statement [implied by the term], 'I will not disclose price information before the contract award' was false *when made*." *Id.* at 290–91. Shah contended, as Freed does, that the statement was neither true nor false when made, but was merely a prediction of future performance. *Id.* at 290. The court rejected this argument as we do today. "Since a promise necessarily carries with it the implied assertion of an intention to perform it follows that a promise made without such an intention is fraudulent and actionable in deceit." *Restatement (Second) of Torts* § 530(1) cmt. c.; *See also Elmore v. United States*, 267 F.2d 595, 603 (4th Cir. 1959) (holding that a statute making it a crime to knowingly make a false statement to influence the action of the Commodity Credit Corporation should include "not only false statements of existing fact but also false and fraudulent promises which the maker does not intend to perform.").[3]

---

[3] This Court impliedly held as much regarding 18 U.S.C. § 1001 in *United States v. Elliott*, 771 F.2d 1046, 1049–50 (7th Cir. 1985). In *Elliott*, an

(continued...)

With that, we move to the case at hand. In particular, we must determine whether the government put forth sufficient evidence to establish that Freed had a present intent not to abide by the provisions in the contracts when each were made. We conclude it did.

Count 14 involved a covenant in the amended loan agreement between UGV and Cole Taylor. The agreement Freed signed declared that "[t]he Borrower and Co-Borrower covenant and agree to provide to [Cole Taylor] a release and termination of the [pledge of the TIF note to Bank of America] by no later than October 31, 2009." The record indicates that in a meeting before the loan amendment was approved, Freed agreed to obtain a release from Bank of America by August 20. Additionally, one of Freed's associates during a meeting just before the amended loan agreement was signed stated that they were already in talks with Bank of America to obtain the release. But Freed failed to even notify Bank of America of the double pledge during the relevant time period. In fact, Bank of America did not learn of the double pledge until 2010. Based on Freed's failure to alert Bank of America to the double pledge during the relevant time period, and his repeated promise and failure to remedy the situation, a reasonable juror

---

[3] (...continued)
ambitious real estate agent was convicted of knowingly making a false statement to an agency in violation of 18 U.S.C. § 1001. *Id.* at 1049. The Court noted that Elliott's claim that he intended to inhabit a residence was false when he signed the loan agreement because his loan application did not include information about other properties he owned, he never put the utilities in his own name, and he entered into a contract to rent the property less than sixty days after the purchase. *Id.* at 1049.

could infer that Freed never intended to obtain the release when he promised to do so.

Finally, Count 16 involved the following provision in a construction loan agreement between Bank of America and the Streets of Woodfield:

> Borrowers may make Distributions provided … cash and cash equivalents remaining after such a distribution shall be not less than an amount equal to the aggregate of (A) the total amount of [tenant security deposits], (B) an amount sufficient to provide for the real estate taxes on the Premises to be paid in the current year …, and (C) a reasonable working capital reserve.

The government provided evidence that when the agreement was signed the Streets of Woodfield only had $19,000 in its cash reserves, despite the fact that the yearly property taxes were around $4 million. Furthermore, the day after signing the agreement, Freed withdrew $273,000 and his withdrawals in April alone totaled $1.3 million. The lack of capital in the Streets of Woodfield reserves, along with Freed's immediate and continuous withdrawal of substantial funds, could cause a reasonable juror to infer that Freed did not intend to abide by this term when he signed the agreement. Thus, the government provided ample evidence that Freed did not intend to keep this promise when he made it.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.