In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 19-1305

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SCOTT GINSBERG,

*Defendant-Appellant*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-CR-00462(1) — **Sara L. Ellis**, *Judge*.

———————

ARGUED FEBRUARY 13, 2020 — DECIDED AUGUST 21, 2020

———————

Before FLAUM, MANION, and BARRETT, *Circuit Judges*.

MANION, *Circuit Judge*. A jury found Scott Ginsberg guilty of bank fraud. On appeal, he argues there was insufficient evidence that he knowingly defrauded the banks. He also argues the district court erred by allowing certain testimony by a closer. Ginsberg is the only defendant in this case. Whether or not there are other people who might have deserved blame, or other transactions that might have been illegal, they are not before us. We focus on Ginsberg.

Spring Hill Development, LLC, owned a 240-apartment complex in a Chicago suburb. In 2007, the owner converted the apartments into condominiums and attempted to sell them. The record is unclear about the seller's motives. Ginsberg's attorney intimated at trial that the seller desperately needed to get rid of the properties, so it would do almost anything to sell them. During closing arguments, he said he "imagine[d]" the interest rates the seller faced were "getting pretty high."

Ginsberg made arrangements with the seller. He recruited several people to buy units in bulk, telling them they would not need to put their own money down, and telling them he would pay them after the closings. The scheme was a fraud, with Ginsberg at its center.

The fraudulent scheme consisted of multiple components and false statements to trick financial institutions into loaning nearly $5,000,000 for these transactions. One key was that the seller made payments through Ginsberg that the buyers should have made, which meant that the stated sales prices were shams, the loans were under-collateralized, and the "buyers" had no skin in the game. The seller paid Ginsberg about $1,200,000. Of this money, he used nearly $600,000 to make payments the buyers should have made. He also paid over $200,000 to the buyers and their relatives. And he kept nearly $400,000 for himself. Through this scheme, the seller paid for the buyers. That is not the direction money should flow in these transactions, according to the financial institutions. The loans ultimately went into default, causing the financial institutions significant losses.

## I. Background

We view the trial evidence in the light most favorable to the government. *United States v. Wade*, 962 F.3d 1004, 1012 (7th Cir. 2020). In 2007, Scott Ginsberg learned of apartments changing into condominiums in Roselle, Illinois. Ginsberg searched for people with good credit to buy units. He told potential buyers he negotiated a great deal with the owners of the complex. He told potential buyers they would not need to spend their own money toward down payments even though the transactions required the buyers to provide down payments or closing funds. He told potential buyers he would pay them up to $10,000 after each closing.

Ginsberg recruited three buyers for a total of 32 units at the complex: Gregory Callahan, Judith Ellis, and Martin Swidler. The recruits were not rich. Callahan earned about $70,000 to $80,000 annually working in information technology. Ellis earned about $70,000 teaching. Swidler grossed at most about $11,500 per month repairing computers.

Ginsberg arranged for Callahan to buy 20 condos, for Ellis to buy 10 condos, and for Swidler to buy 2 condos during the summer of 2007. The sales prices of these 32 units ranged from $159,000 to $207,000, and exceeded $5,500,000 in total.

Ginsberg's buyers financed the purchases with approximately $4,800,000 in mortgage loans from various lenders. The loans went into default. None of the buyers ever used any of their own money to pay the mortgages.

One component of the scheme was to use false verification of deposit forms to induce the mortgage lenders to believe Ginsberg's buyers had sufficient assets to make the down payments. On June 18, 2007, National City Bank veri-

fied that Swidler had $83,571.59 on deposit. On August 7, 2007, the same bank verified that Ellis had $59,463.10 on deposit in the same account. These verification forms were given to various lenders. But the account listed on these verification forms as belonging to Swidler and Ellis actually belonged to Ginsberg. He had added them to his account.

Ellis[1] testified her name was printed on a signature card, but the associated signature was not hers. She testified she never discussed with Ginsberg any desire to share a joint bank account and she never went with him to a bank to sign onto an account with him. She testified she never authorized him to put her name on his account.

Swidler testified Ginsberg told him the purpose of adding Swidler to Ginsberg's account was, among other things, to help with the process because Swidler "didn't have a lot of assets and … this would show an additional asset."

Another part of the scheme was Ginsberg receiving funds from the seller and using these funds to satisfy his buyers' obligations without disclosure to the lenders. Ginsberg arranged for the seller to make "incentive payments" to him in return for him finding buyers to purchase units in bulk. This arrangement was memorialized in documents called "Second Amendment to Real Estate Sale Contract."

In the Second Amendments, the seller agreed to pay Ginsberg "incentive payments" of "10% of the purchase price and $20,000" for each unit purchased by one of his buyers in return for the buyers purchasing in bulk. The Second Amendments stated Ginsberg was to hold the incentive

---

[1] Ellis received immunity.

payments in escrow and to use them "to pay the Purchaser's Principal, Interest, Taxes and Condominium Association Assessments until the Incentive Payment is retired in full." Thus, the seller gave money to Ginsberg to pay the buyers' costs.

So why did the seller pay for the buyers? Ginsberg's attorney intimated at trial that the seller desperately needed to dump the properties, so it would do almost anything to sell them. He said he "imagine[d]" the interest rates the seller faced were "getting pretty high."

No one gave a copy of a Second Amendment to any of the mortgage lenders for the three buyers at issue here. Instead (with one limited exception) these lenders received only the initial real estate contracts, which did not mention any "incentive payment" to Ginsberg to use for the principal, interest, and other costs associated with the loans.

Banker Scott Husted (formerly of IndyMac Bank) testified he would expect to receive copies of the original contract and any amendments or addendums to review before funding the transaction. And he specifically testified that he would have expected the Second Amendment to be given to the lender, but it "was never provided to us." He testified he was "shocked" the first time he saw it because he had never seen it before. Kevin Kotch of Chase Bank testified Chase needed "the full and complete purchase contract" at the initial stage of a borrower applying for a mortgage.

At the closings, Ginsberg received checks issued by the title company for the "incentive payments." But the settlement statements for the 32 transactions listed the amounts paid to

Ginsberg not as "incentive payments" paid to him as escrowee for the buyers but as "consulting fees."

The "incentive payment" / "consulting fee" paid to Ginsberg for each transaction ranged from $35,900 to $41,300 (always 10% of the sales price plus $20,000). The incentive payment hid as a "consulting fee" on the seller's side of the settlement statement, the side subjected to less scrutiny by lenders in 2007.

The total paid to Ginsberg in the 32 transactions was $1,201,000. He used $578,658 to pay the down payments his buyers were supposed to provide. He paid $237,077 to the straw buyers and their relatives after the closings. And he kept the remaining $385,265 for himself.

Husted testified sellers were not permitted to give buyers cash payments or money back as part of a transaction because that would essentially lower the sales price.

Each of the 32 purchases made by Ginsberg's buyers required the buyer to provide a down payment or other payment at the time of closing. Husted testified about the importance to the lender of knowing the source of the down payment. He testified about limits on gifts to buyers. He testified about the impermissibility of a broker or seller participating in the transaction and gifting the down payment.

The prosecutor also asked Monique Croon (formerly of Republic Title) about a HUD-1 settlement statement: "And so when it says cash from the borrower, is that money that the borrower is supposed to bring for the closing?" The witness said yes.

Vicky Olson, of Bank of America, also testified about the importance of the buyer actually paying:

You're always looking for the borrower to put money in, their own money into the transaction. Depending on the loan-to-value, you could have other sources, which would be a gift, and that gift would have to come from a family member. Again, the borrower still has to put a specific amount of money into the transaction themselves, but they could supplement that from gift funds.

But none of the buyers actually paid any of their own funds toward a down payment, or toward any part of the purchases. Ginsberg told them they would not have to.

Ellis testified she did not provide any money for the "earnest money" or "Cash From Borrower" despite the settlement statement's representations. She contributed none of her own funds to any down payments, mortgage payments, or other payments associated with the properties she "purchased." Swidler also testified he did not put any of his own money down as earnest money or as a down payment for the condos he "purchased" and he did not use any of his money to pay off the mortgages. He did not spend any of his money on these condos. His understanding was that Ginsberg would handle the financials. Swidler would use some of the cash he received after the closings to pay the mortgages. Callahan also testified he did not put any of his own money into the transactions as earnest money or down payments, despite the requirements in the settlement statements. He testified Ginsberg told him he would get about $10,000 per unit, half to pay the mortgages and half to keep.

Here is how the scheme worked. The transactions closed in clusters, with multiple closings on a given day. Ginsberg attended all the closings and provided funds for the down

payments. He brought a check to fund the first closing of the day. He received a "consulting fee" from the seller in connection with that closing. He had the closers at the title company split this fee into multiple checks: one payable to him (or his company) and the other payable to the title company in an amount equal to the amount of the buyer's funds for the next closing. So he used part of the first "consulting fee" as the buyer's funds for the second closing of the day. Then he used a portion of his second "consulting fee" of the day as the buyer's funds for the third closing of the day. Et cetera. Sometimes Ginsberg also had the title company cut a check payable to the seller for the earnest money purportedly paid by the buyers. Thus, through Ginsberg, the seller made the payments the buyers should have made. The lenders did not know about the check-splitting. The lenders did not know the buyers contributed none of their own money.

One of the closers, Maureen Welborn, had never seen anything like this before. She raised her concerns with a supervisor, who said something to the effect of "ours is not to question, ours is to close," telling her to go ahead with the transactions. Welborn testified about the closers arranging the documents in order to make sure money from one transaction flowed into the next: "[W]e would bring in the files and then we would lay them out because we called them our 'goesinta' files. So we had to know that was going into 2, 'goesinta' 3." She did not tell the lenders Ginsberg was providing the buyers' down payments. No documents given to the lenders showed that Ginsberg was providing the down payments with money from the seller.[2]

---

[2] An F.B.I. special agent also testified in detail about the machinations of the closing process executed by Ginsberg.

The loan applications and other documents submitted to the lenders contained multiple false representations about the transactions, including the sales prices, the sources of down payments, the true nature of the fee paid to Ginsberg, and the buyers' financial pictures.

Representatives of various lenders testified at trial that the amount and source of the down payment was an important factor in the lenders' decision to issue a loan. Olson testified that if the source of the down-payment money had been disclosed to Bank of America as coming from an interested party, and not the buyer, Bank of America would not have funded that mortgage.

Timothy Lockwood of Wells Fargo Bank testified to the same effect:

> We're looking for the borrower to have a vested interest in the transaction. We want them to have their own money in the transaction, basically skin in the game. … That they are actually investing along with the lender in this property. So they're putting a percentage down of their own money into the property, and then the lender is providing a mortgage for the rest. … So if we knew that somebody else was providing a down payment or giving money towards the transaction, it would not be acceptable. … If somebody buys an investment property, we want more skin in the game, more money into the transaction from the borrower.

Kotch likewise testified:

> So in a purchase transaction we would expect them to bring their own funds, and the application would tell

us the level of funds that they had. … When they invest [their own money] in real estate, they're more likely to repay, and that offsets our risk. … If they didn't have any of their own funds [as the down payment], we would have declined [the loan].

The representatives also testified that although a small credit from the seller was permitted to cover the buyer's fees, a seller was not permitted to give a buyer a cash payment, money for the down payment, or any other incentive payment or enticement. These payments would effectively mean that the listed sales price was not truly the price paid by the buyer, and would call into question whether the transaction was at arm's length. Some of the representatives testified that the lenders would not usually approve a loan with this payment, or would reduce the listed sales price by the amount of the payment. One problem for a lender is that if it issues a loan close to the amount of a fabricated sales price, but the property is worth substantially less than the fabricated sales price, then the property is inadequate collateral. Husted testified IndyMac Bank did not issue loans exceeding the sales price.

The representatives also testified about straw buyers. A straw buyer, according to the testimony, is a person put into a transaction to act as the borrower and to buy the property but (without the lenders' knowledge) who is not expected to occupy the property or repay the debt. Banks would not knowingly loan to straw buyers.

For example, Husted testified IndyMac Bank would not knowingly make loans to straw buyers. Kotch testified that if a seller were providing money to the borrower to make future mortgage payments, that would undercut Chase's con-

fidence in the borrower's willingness or ability to repay the loan.

Ellis was precise and candid about her role as a straw buyer:

> I did not purchase properties. … I was giving permission for my name to be used. … [My role was nothing] but to show up at the closings and sign. … I was not going to put up any money. … [My goal] was just to receive my stipend. … [The stipend was for] the use of my name and for my time. … [W]e were not purchasing because we had no money to purchase. … [W]e didn't have any money to invest. … The only way we were going to make money was the stipend I was getting for my name. There was never any understanding that we were going to be investors in this.

She was a straw buyer.

In his closing argument, defense counsel essentially agreed that the lenders would not have approved the loans if they had known the contents of the Second Amendments:

> In this case, there was this second amendment. Now, yes, you've heard from the bank people that, well, the content of the second amendment is not something that they would have approved. I don't disagree with that. I don't know what their standards are, what their regulations require, but obviously that was something that they would not have approved because they saw too much money coming into the transaction from outside sources, in this case coming in from the seller, because that's where the money was coming in from.

Defense counsel went on to blame the seller and its attorney for drafting the documents and orchestrating the scheme. Defense counsel argued Ginsberg did not prepare any documents related to the underwriting or funding of the loans. Defense counsel argued the government failed to show Ginsberg knew the contents of those documents.

The jury found Ginsberg guilty on all 12 counts. The judge sentenced him to 30 months in prison.

On appeal, Ginsberg challenges the sufficiency of the evidence that he knowingly defrauded the banks. He also argues the judge erred by admitting certain testimony from closing agent Maureen Welborn.

## II. Analysis

### A. Insufficient evidence?

Ginsberg argues the evidence was insufficient to support the jury's finding that he knowingly participated in the scheme with the intent to defraud the lenders. He faces an "uphill battle." *United States v. Khattab*, 536 F.3d 765, 768–69 (7th Cir. 2008). On such a challenge, "we review the evidence in the light most favorable to the government, and we will overturn a jury verdict only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016). We will not re-weigh the evidence or second-guess credibility determinations. *United States v. Cardena*, 842 F.3d 959, 994 (7th Cir. 2016). We make all reasonable inferences in favor of the government. We will only overturn a verdict for insufficiency of the evidence "if the record is devoid of evidence from which a reasonable jury could find

guilt beyond a reasonable doubt." *United States v. Stevenson*, 680 F.3d 854, 856 (7th Cir. 2012).

To prove bank fraud (18 U.S.C. § 1344) the government must prove that: (1) there was a scheme to defraud a financial institution; (2) the defendant knowingly executed or attempted to execute the scheme; (3) the defendant acted with the intent to defraud; (4) the scheme involved a materially false or fraudulent pretense, representation, or promise; and (5) at the time of the charged offense the entity was a "financial institution" within the meaning of 18 U.S.C. § 20. *United States v. Freed*, 921 F.3d 716, 722 (7th Cir. 2019).

Here, there was more than sufficient evidence to show that Ginsberg knowingly executed a scheme with the intent to defraud. The evidence showed he made arrangements for the seller to pay him "incentive payments" out of which he would provide funds toward the purchases. He recruited three people to "buy" a total of 32 units by promising they would not have to use any of their own money and by promising to pay them after the closings. He added two of the buyers' names to his bank account to make these buyers appear financially qualified for the loans. In the light most favorable to the government, he encouraged the "buyers" to falsify their financial pictures.

For example, Ellis testified her husband told her that Ginsberg "wanted to know whether we could bump up our income and that he needed it to have a little more income." Ellis told her husband she was "only a teacher." He asked about tutoring. She said she did not tutor. She had not tutored for many, many years. But then "Ellis Tutoring" showed up on her loan application as one of her employers in 2007, along with an extra $2,300 per month. She had never

heard of or talked about any entity called "Ellis Tutoring." The jury was free to see less truth and more malice in this than in a hallucination. Her application also listed sham bank accounts and fancy concocted cars.

He attended all the closings, collected over $1.2 million in "incentive payments" falsely labeled on the settlement statements as "consulting fees," and paid the down payments even though the buyers were supposed to pay. Various documents stated that the buyers would make certain payments at the closings. Representatives of lenders testified about the importance of the source of these payments. If the seller ultimately provides the funds for these payments, then the stated purchase price is a spurious, worthless fabrication, the collateral is likely worth less than the loan, the "buyer" is likely a straw buyer with no skin the game who might bail at a sign of trouble, and the loan is therefore a bad risk. After the closings, Ginsberg paid the buyers $237,077. And he kept $385,265.

The evidence was more than sufficient for the jury to conclude Ginsberg knew that the loan applications, real estate contracts, and settlement statements contained materially false information about the transactions, including the sales prices, the down payments purportedly made by the buyers, and the fees paid to Ginsberg.

On appeal, Ginsberg focuses on the loan applications. He claims they were the lynchpin of the government's case.[3] He argues he did not prepare the loan applications. But the gov-

---

[3] We have no quarrel with the proposition that the applications were significant to the case, but they were far from the only pieces of evidence against him.

ernment had no burden to prove he personally and directly executed every part of the scheme and prepared every document involved. *See Freed*, 921 F.3d at 722. He argues there was no evidence that he had any knowledge of the contents of the loan applications. He is wrong. Ample evidence allowed a reasonable jury to conclude he knew the loan applications presented false pictures of the buyers' finances, or he knew investigations by the lenders into the applications would produce false pictures. Copious evidence allowed a reasonable jury to conclude he knew the sales prices listed on the loan applications were spurious because he knew the seller was contributing substantial sums toward the purchases. Abundant evidence allowed a jury to conclude he knew the statements on the loan applications indicating the buyers would provide funds at the closings were false.

Ginsberg also argues he did not deceive the lenders because the settlement statements listed the amounts of his fees, and the government did not show he had any involvement in preparing the settlement statements or labeling the "incentive payments" as "consulting fees." But, again, the government did not need to prove he personally prepared the settlement statements. Instead, it needed to prove he knowingly, with an intent to defraud, *participated* in a scheme involving materially false representations. *See United States v. Yoon*, 128 F.3d 515, 524–25 (7th Cir. 1997). Ginsberg correctly notes the settlement statements listed his fee amounts. But neither the settlement statements nor any document given to the lenders showed the nefarious uses of those fees.

Ginsberg attempts to contradict this by arguing he emailed to Chase Bank on July 14, 2007, a Financing Rider

that stated the seller was paying him "an incentive in the amount of $20,000.00" plus another 10% "provided the Buyer closes with a lender designated as a Preferred Lender by seller." So he argues that not only does every settlement statement list the fee, he even told Chase what it is. But this argument fails for many reasons.

One, Ginsberg points us to the bates number of the Financing Rider he claims to have emailed to Chase, but he points us to no trial evidence that he actually emailed this document to Chase (or to any other lender). The page he points us to bears no indication he emailed it to Chase (or to any other lender). To add to the uncertainty about the document's delivery, the identified page has what appears to be a fax header and its bates number begins "WELLS," apparently as in "Wells Fargo."

Two, contrary to Ginsberg's argument, the identified page says nothing about any incentive payment *to Ginsberg*. Instead, the Rider says it is part of the contract between Spring Hill Development and Gregory Callahan. The seller agrees to the incentive and the buyer agrees to certain allocations of the incentive, with no mention of Ginsberg.

Three, contrary to Ginsberg's argument, the Rider says nothing about a payment of $20,000 to anyone. Rather, it provides for a reduction of the purchase price by $20,000.

Four, the signature block for the seller is blank. Only Callahan signed the document.

Five, a Wells Fargo representative testified that the terms of this Rider would not have been permissible for Wells Fargo because they would have constituted excessive enticements. He also testified Wells Fargo did not have a copy of it.

And six, most importantly, the Rider does nothing to undermine the mountain of evidence that Ginsberg executed a scheme to defraud the lenders. On appeal against the sufficiency of the evidence, it is not enough to show there might have been some evidence to support a finding of not guilty. Ginsberg must show that the record is devoid of evidence upon which a reasonable jury could find guilt beyond a reasonable doubt. Even if we construed this Rider as a bit of evidence in his favor—a construction we need not adopt given the ambiguities and the procedural posture—still this Rider is not enough for him to win the uphill battle.

Ginsberg argues the banks knew what they were doing and knew what he was doing so they could not be defrauded. But the record belies these propositions. A reasonable jury had ample evidence to find he knowingly executed a scheme with the intent to defraud the lenders. He recruited three straw buyers of modest means to buy 32 units in about seven weeks. The rapid timing of the clustered closings helped conceal the truth from the banks because credit reports take time to capture past transactions. He added Ellis and Swidler to his bank account to deceive the lenders about their abilities to repay the loans. The banks did not know this was a sham. He served as the central figure in the check-splitting "goesinta" process, through which the seller paid funds that the banks thought came from the buyers. After the closings, he gave the straw buyers some money to use for the mortgage payments and some money to keep. A reasonable jury had sufficient evidence to conclude the banks did not know about this plan, and that Ginsberg knew they did not know. Moreover, Ginsberg does not contest the proposition that the banks would not have made these loans had they known the full truth.

Besides, federal bank fraud is not in the eye of the beholder. "Materiality requires only the tendency or capability of influencing the victim; there is no requirement that the misrepresentations must have actually influenced the decision-maker or that the decision-maker in fact relied on the misrepresentations." *United States v. O'Brien*, 953 F.3d 449, 460 (7th Cir. 2020). Whether the banks were actually deceived is immaterial for these purposes. What matters is whether the scheme Ginsberg executed "was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994). The jury heard plenty of evidence it was.

Ginsberg insists that every single person at the closings was aware he was receiving payments from the seller. But the lenders did not attend these closings, they did not see the "goesinta" scheme, they did not know the true purposes of the fees paid to Ginsberg, they did not know the seller was funding the purchases, and they did not know the "buyers" had no skin in the game.

Ginsberg might make some colorable arguments. But they are insufficient to win the uphill battle. His attacks on bits of evidence do not show there was no evidence upon which a reasonable jury could find guilt.

B. Irrelevant and unfairly prejudicial hearsay?

Ginsberg argues the court erred by allowing Welborn to testify that Dianne Philippe, a fellow employee of the title company, received a call from an unidentified banker about unidentified loans which were about to close. Ginsberg argues these other loans had nothing to do with the transactions in this case, except they also involved Ginsberg. He ar-

gues Welborn paraphrased what Phillipe said, who was par-aphrasing what the unidentified banker said during the call. According to Ginsberg, the testimony was that the banker ordered Phillipe to stop the closings because there were mul-tiple transactions under the same name. Ginsberg argues this testimony was irrelevant, hearsay, and unfairly prejudicial.

We review evidentiary decisions for abuse of discretion. Even if the court erred, we will not reverse if the error was harmless. An evidentiary error is harmful only if it had a "substantial and injurious effect or influence on the jury's verdict." *United States v. Bonin*, 932 F.3d 523, 542 (7th Cir. 2019). Evidentiary errors are harmful "only when a signifi-cant chance exists that they affected the outcome of the tri-al." *Id.*

At trial, the prosecutor crossed Welborn. He asked her, "Why did these transactions stop?" Defense counsel object-ed. The court held a sidebar with the attorneys. The prosecu-tor said he anticipated the testimony would be that the transactions stopped because the lenders realized another Ginsberg-recruited buyer was purchasing four or five differ-ent properties and there was false information in the applica-tions. So the title company shut down the closings and banned Ginsberg from doing any business. The parties had agreed not to go into this at a prior trial of Ginsberg. But that prior trial ended in a mistrial. The prosecutor at the second trial argued the superseding indictment expanded the scope of the scheme, and made this issue relevant. Defense counsel argued against relevancy. But the court decided it was rele-vant, "especially if Mr. Ginsberg is saying that he didn't di-rect anything, that he didn't have any intent or anything else, that if the banks believed that they did not want to deal

with him anymore and they said they think that there's something funny going on here and they specifically banned him, then it's relevant." The court also noted it was "relevant to whether he knew that the information on those documents was false or misleading."

The prosecutor resumed questioning Welborn after the sidebar:

Q: These transactions stopped around late September, is that right?

A: Yes.

Q: And that was because there was another purchaser attempting to purchase some properties, is that correct?

A: Yes.

Q: During the course of the transaction, you or Ms. Philippe received a call from one of the lenders asking you to shut down the transaction, is that correct?

A: The lender called regarding a file regarding the buyer. Then Dianne asked: Which file? Then the lender said: What do you mean, which file? At that point, she said the lender said—

Defense counsel: Objection to the conversation as being hearsay.

Prosecutor: Your Honor, I'll rephrase the question.

Court: So, Ms. Welborn, it's just why were these transactions stopped.

A: The transactions were stopped because a lender requested—I'm trying to think how it even went.

Prosecutor: Let me ask you the question. Did a lender tell you not to close the loan?

A: Yes, eventually that's what the lender told us, not to close the loan.

Q: And that was because the lender found out that—

Defense counsel: Objection.

A: That there were—

Court: Sustained, sustained. Do you know why the lender told you?

A: Because that's when the lender found out there were multiple transactions under the same name.

Prosecutor: With different lenders.

A: With different lenders.

Q: After that, the closings stopped.

A: Yes.

Q: Now, on the particular date when you communicated to the lawyers that the transaction was not going to be allowed to close, they tried to pressure you to close the deal.

Defense counsel: Objection, Your Honor.

Court: Sustained.

A: Yes, unfortunately, yes.

Court: It was sustained. All right.

Defense counsel: The answer is stricken?

Court: Yes, the answer is stricken. Ladies and gentlemen, you're instructed to disregard the answer to that last question. Go ahead [prosecutor].

Prosecutor: Mr. Ginsberg also directed you to close the transaction, didn't he?

A: I wouldn't use the word "directed." He requested.

Q: Did he tell you: Come on. Work your magic. Let's close this deal.

A: Yes.

Defense counsel: Objection, Your Honor.

Court: Overruled.

On appeal, Ginsberg challenges portions of this testimony as irrelevant, hearsay, and unfairly prejudicial.

Regarding relevancy, we see no abuse of discretion. The judge's explanations during the sidebar satisfy us. Evidence need not be dispositive to be relevant.

Regarding hearsay, on appeal Ginsberg construes the challenged testimony as "the statement of a non-testifying banker that other loan applications were somehow fraudulent." (Appellant's Br. at 29.) Again, we see no abuse of discretion. Within our standard of review, we do not see an admitted out-of-court statement from the banker offered for the truth of the matter asserted. The court had discretion to deem the testimony, "that's what the lender told us, not to close the loan," as simply not hearsay, but an instruction. The court also had discretion to deem the answer to the question about why the lender said what he said—"Because that's when the lender found out there were multiple transactions under the same name"—as simply not hearsay.

Regarding unfair prejudice, defense counsel never articulated this particular objection during the sidebar or during the testimony about the call. But setting aside forfeiture, we see no abuse of discretion. The testimony might have been prejudicial—that's usually the prosecutor's point—but it was not unfairly so.

In sum, the judge committed none of the claimed evidentiary errors. And any of the claimed evidentiary errors would have been harmless anyway, given the substantial independent evidence of guilt.

We affirm.